IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ACP Holding Company, et al.,[1] | ) | Case No. 03-12414 (_____) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## AFFIDAVIT OF GARY W. LACHEY, VICE PRESIDENT – FINANCE, TREASURER, SECRETARY AND CHIEF FINANCIAL OFFICER OF ACP HOLDING COMPANY, NFC CASTINGS, INC., NEENAH FOUNDRY COMPANY AND CERTAIN OF ITS SUBSIDIARIES, IN SUPPORT OF FIRST DAY MOTIONS

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) |
| COUNTY OF NEW CASTLE | ) |

GARY W. LACHEY, being duly sworn, deposes and states:

I am the Vice President – Finance, Treasurer, Secretary and Chief Financial

Officer of ACP Holding Company, NFC Castings, Inc., Neenah Foundry Company, Cast Alloys,

Inc., Neenah Transport, Inc., Advanced Cast Products, Inc., Gregg Industries, Inc., Mercer Forge

Corporation, Deeter Foundry, Inc., Dalton Corporation, Belcher Corporation, Peerless

Corporation, A&M Specialties, Inc., Dalton Corporation, Warsaw Manufacturing Facility,

Dalton Corporation, Ashland Manufacturing Facility, Dalton Corporation, Kendallville

Manufacturing Facility, Dalton Corporation, Stryker Machining Facility (collectively, the

---

[1]  The Debtors consist of the following entities: ACP Holding Company, NFC Castings, Inc., Neenah Foundry Company, Cast Alloys, Inc., Neenah Transport, Inc., Advanced Cast Products, Inc., Gregg Industries, Inc., Mercer Forge Corporation, Deeter Foundry, Inc., Dalton Corporation, Belcher Corporation, Peerless Corporation, A&M Specialties, Inc., Dalton Corporation, Warsaw Manufacturing Facility, Dalton Corporation, Ashland Manufacturing Facility, Dalton Corporation, Kendallville Manufacturing Facility, Dalton Corporation, Stryker Machining Facility.

"Debtors").[2]  I am generally familiar with the day-to-day operations, business and financial affairs and books and records of the Debtors.

1.      On August 5, 2003 (the "Petition Date"), the Debtors each filed a petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.

2.      To enable the Debtors to minimize the adverse effects of the commencement of their chapter 11 cases on their business, the Debtors have requested various types of relief in a number of applications and motions (collectively the "First Day Motions"). The First Day Motions seek relief intended to, among other things, maintain customer loyalty, engender vendor and supplier confidence and bolster employees' morale.  Each First Day Motion is crucial to the Debtors' reorganization efforts.

3.      I submit this Affidavit in support of the First Day Motions.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.  All facts set forth in this Affidavit are based on my personal knowledge, upon information supplied to me by others employed by the Debtors, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtors operations, financial conditions and their present liquidity crisis.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am duly authorized to submit this Affidavit.

---

[2]    A chart reflecting the Debtors' corporate structure is attached hereto as <u>Exhibit A</u>.

4.     Part I of this Affidavit describes the Debtors' business and the circumstances surrounding the commencement of these chapter 11 cases and Part II sets for the facts in support of the First Day Motions.

## PART I

## BACKGROUND

**B.     The Chapter 11 Filings**

5.     On August 5, 2003 (the "Petition Date"), the Debtors filed voluntary petitions in this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code"). The Debtors continue to manage and operate their businesses as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6.     No trustee or examiner has been appointed in the Debtors' chapter 11 cases and no official committees have been appointed or designated by the Office of the United States Trustee.

**C.     The Debtors' Businesses**

7.     In 1872, Neenah Corporation, the predecessor to Neenah Foundry Company, was founded as a family-run business in Neenah, Wisconsin. In 1997, Neenah Corporation was acquired by NFC Castings, Inc. ("NFC"), a wholly owned subsidiary of ACP Holding Company ("ACP"). Later in 1997, Neenah Foundry Company, then a wholly owned subsidiary, was merged with and into Neenah Corporation which was then renamed Neenah Foundry Company ("Neenah"). Thereafter, Neenah began a strategic initiative to grow and diversify its businesses by acquiring similar and complimentary companies in the casting and

forging industries. ACP, NFC, Neenah, and Neenah's domestic subsidiaries[3] are the Debtors in these chapter 11 cases.

8.      The Debtors have manufacturing facilities in Wisconsin, Nebraska, Ohio, Pennsylvania, Indiana, and California. The Debtors sell their products throughout the 48 continental United States.

9.      The Debtors manufacture and market a wide range of iron castings and steel forgings for municipal markets and selected segments of industrial markets. The Debtors' broad range of municipal iron castings include manhole covers and frames, storm sewer frames and grates, heavy-duty airport castings, specialized trench drain castings, specialty flood control castings and ornamental tree grates. The Debtors sell these municipal castings throughout the United States to state and local governmental entities, utility companies, precast concrete manhole structure producers, and contractors for both new construction and infrastructure replacement. The Debtors are also a leading manufacturer of a wide range of complex industrial castings, including castings for the transportation industry, the farm equipment industry, and the heating, ventilation and air conditioning ("HVAC") industry.

10.     In fiscal year ended September 30, 2002, the Debtors' net sales were in excess of $405 million and the book value of the Debtors' assets was in excess of $582 million.

---

[3] The domestic subsidiaries are the following direct and indirect wholly owned subsidiaries of Neenah: Advanced Cast Products, Inc. (as well as its inactive wholly-owned subsidiaries Belcher Corporation and Peerless Corporation), the inactive subsidiary Cast Alloys, Inc., Dalton Corporation (as well as its wholly-owned subsidiaries Dalton Corporation, Warsaw Manufacturing Facility; Dalton Corporation, Kendallville Manufacturing Facility; Dalton Corporation, Stryker Machining Facility; and the inactive subsidiary Dalton Corporation, Ashland Manufacturing Facility), Deeter Foundry, Inc., Gregg Industries, Inc., Mercer Forge Corporation (as well as its wholly-owned subsidiary A&M Specialties, Inc.), and Neenah Transport, Inc. (collectively, the "Subsidiaries").

The Debtors currently employ approximately 2,800 full time employees of whom approximately 2,300 are hourly and 500 are salaried.

## D.     Debt Structure

### (i)     Secured Debt

11.     As of June 30, 2003, there was approximately $146.6 million principal outstanding under the Neenah's existing credit facility (the "Existing Credit Facility"), with JPMorgan Chase serving as agent for the Existing Credit Facility lenders, consisting of: (a) $28.5 million under the revolving credit facility, excluding an additional $864,675.00 of outstanding letters of credit; (b) $5.3 million under an acquisition loan facility maturing in June 2004, (c) $.3 million under the Tranche A term loan maturing in September 2003; (d) $46.8 million under the Tranche B term loan maturing in September 2005; and (e) $65.7 million under the Tranche B2 term loan maturing in September 2005. Neenah's obligations to its lenders under the Existing Credit Facility are secured by a first priority lien in all of its assets and the assets of its Subsidiaries and are guaranteed by NFC and the Subsidiaries on a senior secured basis. As of June 30, 2003, there was approximately $11.6 million outstanding (including accrued and unpaid interest and financing fees) under the $9.9 million face amount of the paid-in-kind note (the "PIK Note") Neenah issued to Citicorp Venture Capital, Ltd. ("CVC") on April 29, 2002. Neenah's obligations under the PIK Note are secured by a second lien on all of its assets and the assets of its Subsidiaries and are guaranteed by NFC and the Subsidiaries. In addition, as of June 30, 2003, the Debtors had approximately $5.4 million in capitalized leases and $16.9 million in unsecured trade debt.

*(ii)  Unsecured Debt*

12.    In addition, as of June 30, 2003, there was approximately $302.9 million outstanding (including accrued and unpaid interest, and excluding an unamortized premium of $2.4 million) under the three tranches of unsecured 11⅛% Senior Subordinated Notes (the "Existing Subordinated Notes") issued by Neenah totaling $282 million in face amount. The active Subsidiaries are guarantors of the Existing Subordinated Notes.

13.    In addition, as of June 30, 2003, there was approximately $5.4 million outstanding (including accrued and unpaid interest) under the $4.3 million face amount senior subordinated note due 2005 issued by NFC to CVC. Furthermore, as of June 30, 2003, there was approximately $6.3 million outstanding (including accrued and unpaid interest) under the $2.5 million senior subordinated note due 2003 issued by ACP and currently held by CVC. Both of these notes are structurally subordinated to the Existing Subordinated Notes and contractually subordinated to the Existing Credit Facility and the PIK Note.

**E.    Recent Developments**

14.    Beginning in 2000, several trends converged to create a difficult operating environment for the Debtors. First, there were cyclical declines in some of the Debtors' most important markets – such as trucks, railroad, construction, and agriculture equipment. Second, there was an inventory adjustment by manufacturers in the HVAC equipment industry, resulting in fewer orders for the Debtors' castings for use in HVAC equipment. Third, domestic foundries have been suffering from excess capacity, increased foreign competition, price reduction pressure from customers and competitors, and increased costs associated with heightened safety

and environmental regulations. Such conditions caused over 75 foundries in the United States to cease operations or file for bankruptcy protection in 2001 and 2002.

15.     In May 2002, William Barrett, formerly chief executive officer of Neenah, assumed the role of chief executive officer of the Debtors. The Debtors' new management implemented a number of aggressive measures to help mitigate the effects of the declining market and to improve cash flow, such as selling numerous small, non-core assets, significantly reducing the number of employees, reducing capital expenditures, and imposing selected price increases.

16.     Nevertheless, as a result of the leverage the Debtors employed to finance their acquisitions and the continuing declines in many of their primary customers' markets, the Debtors' financial flexibility deteriorated. On May 1, 2003, Neenah failed to make a scheduled $15.7 million interest payment on the Existing Subordinated Notes. At such time, Neenah was not in compliance with the March 31, 2003 EBITDA covenant under the Existing Credit Facility and did not have sufficient liquidity to make the interest payment and remain in compliance with the liquidity covenant under the Existing Credit Facility. Accordingly, Neenah was prohibited from making the interest payment pursuant to the terms of the Forbearance Agreement entered into under the Existing Credit Facility.[4]

---

[4] Capitalized terms used but not defined herein have the meaning ascribed to them in the Disclosure Statement, dated as of July 1, 2003 (the "Disclosure Statement") filed contemporaneously herewith.

**F.     The Chapter 11 Cases**

17.     The Debtors commenced these chapter 11 cases to eliminate a substantial amount of debt, significantly reduce cash interest expense payments, and improve the Debtors' balance sheet and operating flexibility.  Additionally, the Debtors seek to complete certain restructuring initiatives and maintain and enhance their market leadership position.

18.     On May 1, 2003, the Debtors circulated an Offering Memorandum, Solicitation Of Releases, Consents and Acceptances and Disclosure Statement (collectively the "Offering Memorandum"), together with a plan of reorganization.  The Offering Memorandum commenced both an exchange offer on the Existing Subordinated Notes and the prepetition solicitation of acceptances of a plan in accordance with section 1126(b) of the Bankruptcy Code.  The exchange offer, which was to be completed outside of Court, did not result in the requisite percentage of Existing Subordinated Notes tendered, and both the exchange offer and the solicitation of acceptances for the May 1, 2003 plan of reorganization were allowed to expire.

19.     Shortly after the Offering Memorandum was circulated, Neenah entered into confidentiality agreements with Holders of a majority of the Existing Subordinated Notes who had formed an unofficial committee that has worked with the Debtors to develop and finance a revised plan of reorganization.

20.     On July 1, 2003, the Debtors circulated the Disclosure Statement for the prepetition solicitation of votes with respect to the Prepackaged Joint Plan of Reorganization of ACP Holding Company, NFC Castings, Inc., Neenah Foundry Company and Certain of Its Subsidiaries under Chapter 11 of the United States Bankruptcy Code (the "Plan").  The Plan is

the result of detailed negotiations with the Holders of Existing Subordinated Notes represented on the unofficial committee and is supported by that committee.

21.     The Debtors have obtained from Fleet Capital Corporation and Fleet Securities, Inc. a commitment letter dated June 1, 2003 committing to provide the New Credit Facility substantially on the terms outlined in the New Credit Facility Commitment Letter, as described in further detail in the Disclosure Statement.

22.     The Debtors have also obtained Standby Commitment Agreements from the Standby Purchasers whereby the Standby Purchasers have collectively agreed to provide the Debtors with up to $110 million of financing for the plan. In connection with that commitment, the Standby Purchasers have been paid 20% of a total commitment fee of $5.5 million, with the remaining 80% to be paid upon approval of the terms of the Standby Commitment Agreements by the Bankruptcy Court. The Debtors have also obtained the agreement of the Holders of the PIK Note to exchange the PIK Note for Second Secured Notes and Warrants pursuant to the Plan. In connection with that agreement, the PIK Note Holders have been paid 20% of a total commitment fee of $250,000, with the remaining 80% to be paid upon approval of the terms of the Standby Commitment Agreements by the Bankruptcy Court.

23.     The Debtors have obtained the requisite votes to confirm the Plan from the Holders of claims or interests entitled to vote on the Plan and, accordingly, the Debtors intend to proceed towards swift confirmation of the Plan.

## PART II

## FACTS IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

24.     On August 5, 2003 the Debtors filed a number of First Day Motions

pertaining to their operational and restructuring activities. I have reviewed each of the First Day

Motions (including the exhibits thereto) and I believe that the relief sought in each: (1) is

necessary to enable the Debtors to operate in chapter 11 with a minimum of disruption or loss of

sales; and (2) constitutes a critical element in achieving the Debtors' successful reorganization.

The First Day Motions consist of the pleadings described below.

### A.     Motion for Order Directing Joint Administration of Chapter 11 Cases

25.     The Debtors' financial affairs and business operations are closely related.

I believe that entry by this Court of an order directing joint administration will avoid the

incurrence by the Debtors of considerable and unnecessary time and expense in connection with,

among other things, the Debtors' filing and service of duplicative motions and notices on

creditors and other parties in interest. I further believe that the relief requested in the Motion is

in the best interests of the Court, the estate, and all parties in interest.

### B.     Motion Seeking Entry of an Order (i) Granting the Debtors Additional Time Within Which to File Schedules and Statements and (ii) Permanently Waiving the Requirement to File Schedules and Statements Upon Confirmation of the Debtors' Joint Prepackaged Plan of Reorganization

26.     By this motion, pursuant to Bankruptcy Rule 1007(c), the Debtors seek a

75-day extension of time from the Petition Date (until October 25, 2003) to file Schedules and

Statements as well as a permanent waiver of the requirement to file Schedules and Statements

should the Plan be confirmed within the same 75 day period.

27. The voluntary chapter 11 petitions filed by Debtors were accompanied by a list of the Debtors' creditors and a more detailed list that includes the Debtors' 30 largest unsecured creditors on a consolidated basis. Moreover, the total number of the Debtors' creditors and parties in interest is approximately 50,000. Pursuant to Local Rule 1007-1(d), the Debtors' current deadline to file the Schedules and Statements expires thirty days after the Petition Date.

28. The Debtors respectfully submit that this motion should be granted for the following reasons. First, these Debtors are large and complicated companies and the Debtors estimate that completing the Schedules and Statements within the standard 30 day time frame would be an extreme burden. Second, in these cases, the Plan already has been fully-negotiated, voted upon and the Debtors are not seeking to bar and subsequently discharge their General Unsecured Claims (as such term is defined in the Plan). Rather, the Debtors' Plan provides that all General Unsecured Claims will be paid in full, except as noted therein, without regard to whether a claim is filed with the Bankruptcy Court. Courts in this District and elsewhere have granted relief similar to this in other prepackaged chapter 11 cases.

29. I submit that any order granting such relief is in the best interest of the Debtors, their estates, and any other parties-in-interest.

## C. Debtors' Motion for Order Authorizing the Debtors to File Customer Lists Under Seal

30. The Debtors are required to compile a list of all potential creditors. Included therein, are all the Debtors' vendors and customers (collectively, the "Customers Lists"). The Debtors will be serving the list of creditors with documents such as the notice of commencement of the cases and notice of various hearings, including but not limited to notice of

confirmation hearing. The Debtors will be required to file an affidavit or certificate of service reflecting that such service was completed. The identity of the entities listed on the Customer Lists are confidential and not known by the Debtors' competitors. Also, it is common practice in the Debtors' industries to keep Customer Lists private.

31.     Accordingly, by this motion, the Debtors respectfully request that the Court enter an order (a) authorizing the Debtors to file the Customer Lists in any pleadings, schedules, statements, exhibits or applications filed in the Chapter 11 Cases under seal, and (b) directing that the Customer Lists shall remain under seal and confidential, and shall not be made available to anyone other than: (i) the Court, (ii) the United States Trustee, and (iii) those persons that have executed a confidentiality agreement acceptable to the Debtors, in their sole discretion.

32.     I therefore submit that an order granting such relief is in the best interests of the Debtors, their estates, their creditors and any other parties-in-interest.

**D.      Motion Seeking Entry of an Order (1) Scheduling Combined Hearing to Consider (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan of Reorganization, as Modified; (2) Establishing Objection Deadline; and (3) Approving Form of Notice**

33.     By this Motion, the Debtors respectfully request entry of an order (the "Scheduling Order"):

a.     scheduling a combined hearing (the "Disclosure Statement and Confirmation Hearing") to consider (1) adequacy of the Disclosure Statement and (2) confirmation of the Plan in accordance with section 1127 of the Bankruptcy Code;

b.   waiving the local rule requirements under Del. Bankr. LR 3017-1(b) which requires that the plan proponent timely file a motion for approval of voting procedures, including the form of ballots, the voting agent, and the time and manner of voting ("Local Rule 3017-1(b)");

c.   establishing objection deadlines for the Disclosure Statement and Confirmation Hearing; and

d.   approving the form of notice, substantially in the form attached to this motion as Exhibit A (the "Notice"), relating to the commencement of these Chapter 11 Cases, and deadlines established by this Court, and the Disclosure Statement and Confirmation Hearing.

34.   The Debtors request that this Court schedule the Disclosure Statement and Confirmation Hearing approximately 50 days after the Petition Date, or as soon thereafter as the Court's schedule permits, to consider the adequacy of the Disclosure Statement and confirmation of the Plan. Once set, the Disclosure Statement and Confirmation Hearing may be continued from time to time by announcing such continuance in open court or otherwise without further notice to parties in interest.

35.   Because the Plan was accepted by each impaired class of creditors entitled to vote thereon, there is no reason to delay consideration of the Disclosure Statement, the solicitation procedures, and the Plan. Furthermore, because the most sensitive and complex tasks required to effectuate a successful reorganization have been accomplished in advance of the commencement of these Chapter 11 Cases (i.e., negotiations of consensual agreement with the

Debtors' secured creditors and bondholders), the circumstances weigh heavily in favor of scheduling the Disclosure Statement and Confirmation Hearing for the earliest date convenient to the Court.

36.     The Debtors further submit that the proposed Scheduling Order is in the best interests of all parties in interest in these Chapter 11 Cases. In addition to the reasons set forth above, it is appropriate that a Scheduling Order be entered at this time in order that creditors and equity security holders may be informed as promptly as possible of the anticipated scheduling of events preceding confirmation of the Plan. The proposed schedule affords creditors and equity security holders ample notice of the proceedings. Furthermore, at a minimum, each of the impaired parties in interest will have had the Disclosure Statement for approximately 75 days before the proposed deadline for objections, and all other parties in interest will have notice and an opportunity to obtain a copy of the Plan and Disclosure Statement almost six weeks prior to the proposed deadline for objections. This allows more than ample time for parties to evaluate the Disclosure Statement and the Plan prior to the proposed hearing such that no party in interest will be prejudiced by the relief requested herein.

37.     The Debtors request that this Court establish an objection deadline (the "Objection Deadline") that is at least ten business days before the Disclosure Statement and Confirmation Hearing as the last day for filing and serving objections to (i) the adequacy of the Disclosure Statement and (ii) the confirmation of the Plan.

38.     The Notice shall contain, <u>inter alia</u>:  (i) the date, time and place of the Disclosure Statement and Confirmation Hearing; (ii) instructions for obtaining copies of the Plan

and Disclosure Statement; (iii) the deadline for filing objections to the adequacy of the

Disclosure Statement and to confirmation of the Plan; (iv) notice of the commencement of these

Chapter 11 Cases; (v) notice of the automatic stay; and (vi) notice of the section 341 meeting of

creditors (if such date has been selected by the United States Trustee by the time that the Notice

is distributed).

39. The Debtors request that the Notice be served, via First Class Mail, to the

following: (a) the indenture trustee for the Existing Subordinated Notes; (b) Holders of Existing

Credit Facility Claims; (c) Holders of PIK Note Claims; (d) Holders of ACP Note Claims;

(e) Holders of NFC Note Claims; (f) Holders of ACP Equity Interests;(g) The Internal Revenue

Service; (h) the Securities and Exchange Commission; (i) The taxing authorities in any

jurisdiction where the Debtors transact business; and (j) all parties having requested papers

pursuant to Bankruptcy Rule 2002. The Debtors believe that notice to the above-listed groups

will give adequate notice to all interested parties.

40. I therefore submit that an order granting such relief is in the best interests

of the Debtors, their estates, their creditors and any other parties-in-interest.

**E.     Debtors' Application for Order Under Section 327(a) of the
       Bankruptcy Code Authorizing the Employment of Pachulski, Stang, Ziehl,
       Young, Jones & Weintraub P.C. as Counsel for Debtors and Debtors in Possession**

41. The Debtors seek to employ and retain the firm of Pachulski, Stang, Ziehl,

Young, Jones & Weintraub P.C. ("PSZYJW") as their bankruptcy counsel with regard to the

filing and prosecution of the Chapter 11 Cases and all related matters, effective as of the Petition

Date.

42.     I believe that the representation of the Debtors by PSZYJW is critical to the success of the Debtors' reorganization.  The Debtors seek to retain PSZYJW as their bankruptcy attorneys because of the PSZYJW's extensive experience and knowledge in the field of debtors' and creditors' rights and the chapter 11 process, the PSZYJW's expertise, experience and knowledge in practicing before the bankruptcy courts, and the PSZYJW's ability to quickly respond to all issues that may arise in the Chapter 11 Cases, including, without limitation, issues related to the Debtors' rights.  In preparing for these Chapter 11 Cases, PSZYJW has become familiar with the Debtors' business and affairs and many of the potential legal issues that may arise in the context of the Chapter 11 Cases.

43.     Accordingly, I believe that PSZYJW is both well qualified and uniquely able to represent the Debtors in the Chapter 11 Cases in an efficient and timely manner.  I submit that the ongoing retention of PSZYJW is in the best interests of the Debtors, their estate, their creditors and any other parties-in-interest.

**F.     Application for Entry of an Order Pursuant to Section 327(A)
         of the Bankruptcy Code and Bankruptcy Rule 2014(A) Authorizing the
         <u>Employment and Retention of Kirkland & Ellis LLP as Attorneys for the Debtors</u>**

44.     The Debtors seek to employ and retain the firm of Kirkland & Ellis ("K&E") of Chicago, Illinois as their counsel with regard to the filing and prosecution of the Chapter 11 Cases and all related matters, effective as of the Petition Date.

45.     I believe that representation of the Debtors by K&E is critical to the success of the Debtors' reorganization.  The Debtors seek to retain K&E as their attorneys because of the Firm's extensive experience and knowledge in the field of debtors' and creditors'

rights and the chapter 11 process and because of its expertise, experience and knowledge practicing before bankruptcy courts, and its ability to quickly respond to all issues that may arise in these Chapter 11 Cases, including, without limitation, issues related to the Debtors' rights. In preparing for these Chapter 11 Cases, K&E has become familiar with the Debtors' businesses and affairs and many of the potential legal issues that may arise in the context of the Chapter 11 Cases. Accordingly, I believe that K&E is both well qualified and uniquely able to represent the Debtors in the Chapter 11 Cases in an efficient and timely manner.

46.    I submit that any order granting such relief is in the best interest of the Debtors, their estates, and any other parties-in-interest.

**G.    Application of the Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a), 2016 and 5002 Authorizing the Employment and Retention of Houlihan Lokey Howard & Zukin Capital as Financial Advisors to the Debtors and Debtors in Possession**

47.    The Debtors seek to retain Houlihan Lokey Howard & Zukin Capital ("Houlihan") as their investment bankers because of Houlihan's excellent reputation for providing high quality financial advisory and investment banking services to debtors and creditors in bankruptcy reorganizations and other debt restructures, and their knowledge of the Debtors' financial and business operations. In preparing for its representation of the Debtors in these cases, Houlihan has become familiar with the Debtors' businesses and affairs. Accordingly, I believe that Houlihan is both well qualified and able to represent the Debtors as their investment bankers in these chapter 11 cases.

**H. Debtors' Application for an Order Appointing Bankruptcy Services, LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c)**

48. By this Application, the Debtors seek an order authorizing it to retain and employ Bankruptcy Services, LLC ("BSI") as claims and noticing agent (the "Claims and Noticing Agent") to, among other things: (a) serve as the Court's noticing agent to mail notices to certain of the estates' creditors and other parties in interest, (b) provide computerized claims, objection and balloting database services, and (c) provide expertise and consultation and assistance in claim and ballot processing and with the dissemination of other administrative information related to the Debtors' chapter 11 cases.

49. I have been informed by counsel that pursuant Del.Bankr.LR 2002-1(f), in all cases with more than 200 creditors, debtors are required to file a motion seeking authorization to retain a notice and/or claims clerk within ten (10) days of the petition date. The Debtors have more than 200 creditors.

50. The Debtors expect that the solicitation of votes on its reorganization plan(s), will necessitate the forwarding of ballots, disclosure statement(s), and related solicitation materials to thousands of creditors, as well as the accurate recordation and tabulation of the numerous ballots that are returned by such creditors. The Debtors desire to retain BSI to assist them in this process.

51. The Debtors have filed these cases as "prepackaged" bankruptcy cases having already solicited and obtained acceptance of their plan of reorganization. I understand that BSI offers a broad range of service, including, receiving, docketing, maintaining, photocopying and transmitting proofs of claim. The Debtors request the relief in this application

acknowledging that some services may not be necessary if these cases proceed as anticipated. The Debtors and BSI will work together in determining the scope of BSI's employment as such services are needed.

52.     Accordingly, I believe that BSI is both well qualified and able to represent the Debtors as their noticing and claims agent in these chapter 11 cases.

## I.     Debtors' Application for an Order Appointing Innisfree M&A Incorporated as Special Noticing Agent Pursuant to 28 U.S.C. § 156(c)

53.     By this Application, the Debtors seek authorization to employ Innisfree M&A Incorporated ("Innisfree") as Special Noticing Agent. The Debtors have the following outstanding public securities ("Public Securities"), 11 1/8% Series A, B, D, and F Senior Subordinated Notes due 2007 (the "Notes"), the Debtors have only an estimate of the number of beneficial holders holding the Public Securities in "street name" though a bank, broker, agent, proxy or other nominee (collectively, the "Nominees"). The successful dissemination of notices to the beneficial owners of the Public Securities thus will require coordination with the Nominees, primarily to ensure that these entities properly forward notices and other materials to their customers.

54.     Innisfree is a proxy solicitation and investor relations firm, whose employees have significant experience advising large, publicly-traded companies, including debtors-in-possession, in matters relating to communications with, and notices to, security holders, assistance with plan solicitations, and the tabulation of ballots with respect to chapter 11 plans. The Debtors wish to engage Innisfree to disseminate certain notices to holders of the Public Securities (as defined above).

55.     Accordingly, I believe that Innisfree is able to represent the Debtors as their special noticing agent in these chapter 11 cases.

**J.     Motion for Order Under 11 U.S.C. §§ 105(a) and 331
        Establishing Procedures for Interim Compensation and
        <u>Expense Reimbursement for Professional and Committee Members</u>**

56.     The Motion establishes procedures for the reimbursement of Court-approved professionals. I believe that the relief requested in the Motion will streamline the professional compensation process and enable the Court and all other parties to more effectively monitor the professional fees incurred in these chapter 11 cases.

**K.     Motion for Order Authorizing the Debtors to Employ and Compensate Certain
        <u>Professionals Utilized in the Ordinary Course of the Debtors' Business</u>**

57.     The Debtors regularly retain the services of various professionals in the ordinary course of operating their businesses (the "Ordinary Course Professionals"). These Ordinary Course Professionals provide services to the Debtors in a variety of discrete matters including, but not limited to, general corporate, auditing, tax, and litigation matters.

58.     The Debtors seek permission to continue to employ the Ordinary Course Professionals postpetition without the necessity of filing formal applications for employment and compensation by each professional pursuant to sections 327, 328, 329, and 330 of the Bankruptcy Code. Although the automatic stay and other issues in these cases may decrease the Debtors' need for certain Ordinary Course Professionals' services, the Debtors cannot now quantify or qualify that need. Due to the number and geographic diversity of the professionals who are regularly retained by the Debtors, it would be unwieldy and burdensome on both the

Debtors and this Court to request that each Ordinary Course Professional apply separately for approval of its employment and compensation.

59. Having historically retained many outside professionals, having outsourced significant business operations, and because it would be virtually impossible to proceed as business entities without the ongoing support and assistance provided by such professionals, the Debtors are requesting approval of a plan which will maximize our ability to retain outside professionals.

60. Based on the foregoing reasons, I submit that the ongoing retention of such outside professionals is in the best interests of the Debtors, their estates and creditors.

**L.     Motion Seeking Entry of an Order Authorizing, But Not Requiring, the Debtors to Pay Prepetition General Unsecured Claims in the Ordinary Course of Business**

61. By this motion (the "Pass-Through Motion"),[5] the Debtors seek the authority to pay all prepetition general unsecured claims in the ordinary course of business. The Debtors' Chapter 11 Cases are the culmination of a lengthy and detailed process designed to restore financial vitality to the Debtors while at the same time providing an appropriate treatment for the Debtors' creditors and equity investors. The Debtors believe that allowing for a

---

[5]    The Debtors filed, contemporaneously with the Pass-Through Motion, a motion seeking entry of an order authorizing the Debtors to honor certain prepetition obligations to customers and to otherwise continue customer programs and practices in the ordinary course of business (the "Customer Programs Motion"), a motion seeking entry of an order granting the Debtors authority to provisionally pay in the ordinary course of business prepetition claims of essential trade creditors (the "Essential Trade Motion"), a motion seeking entry of an order: (a) authorizing the Debtors to pay sales, use and franchise taxes and such other taxes as the Debtors, in their discretion, deem necessary, as well as certain fees, licenses and other similar charges and assessments and (b) authorizing applicable banks and other financial institutions to receive and process, honor and pay all checks presented for payment related thereto (the "Sales, Use and Franchise Tax Motion"), and motion for authority to pay in the ordinary course of business prepetition claims related to shipping charges (the "Shipping Motion").The relief requested in the Pass-Through Motion, among other things, duplicates the relief requested in the Customer Programs Motion, the Essential Trade Motion, and the Sales, Use and Franchise Tax Motion.  As a result, if the Pass-Through Motion is granted, the Debtors reserve the right (and currently intend to) withdraw the Customer Programs Motion, the Essential Trade Motion, and the Sales, Use and Franchise Tax Motion and the Shipping Motion

"seamless" transition into and through bankruptcy will preserve the value upon which the Plan and the agreements memorialized therein are predicated. The Plan provides that all unsecured creditors will be paid in full. To delay these payments would severely disrupt the Debtors' businesses. It would create uncertainty on behalf of the Debtors' vendors, suppliers, customers and consultants. The Debtors believe that these relationships will be irreparably damaged and cause the Debtors to lose customers and favorable trade terms with their vendors and suppliers. This type of disruption can be avoided through the relief set forth herein.

62.     A fundamental aspect of the Debtors' efforts to minimize disruption during their cases is the Debtors' ability to maintain and develop their relationships with important parties who supply goods and provide services to the Debtors, such as vendors, suppliers, customers and consultants. The perception and understanding of these Chapter 11 Cases by such parties is vital to the success of the Debtors' reorganization. Indeed, the relief requested herein is designed to create certainty in the Debtors' relationships with such parties. These relationships will contribute to the continued operation of the businesses of the Debtors during and after these Chapter 11 Cases.

63.     Similar relief is commonly granted in "prepackaged" bankruptcies because in such cases, trade and related claims ordinarily are paid in full, in cash, in the ordinary course of the debtor's business. Accordingly, the Debtors request the authority pursuant to sections 105(a) and 363 of the Bankruptcy Code, to pay, in full, the undisputed unsecured prepetition claims of holders of class 9 claims under the Plan (the "General Unsecured Claims") as such claims mature, in the ordinary course of business during the pendency of these cases. The

Debtors' Plan provides for payment in full of such claims and the Plan has been accepted by the requisite creditor classes. The Debtors believe that denial of this Pass-Through Motion and the inability to pay such claims in the ordinary course would severely impact the Debtors' relationships with their customers, suppliers and vendors. Customers and business opportunities would be lost, having a significant impact on going-concern value. The Debtors estimate that, if the Pass-Through Motion is granted, approximately $17,000,000 of ordinary course payments to holders of General Unsecured Claims will be made during the next 60 days - the Debtors' expectation as to the maximum duration of these cases.

64.     The Debtors also request that (1) all applicable banks and other financial institutions be authorized to receive, process, honor and pay any and all checks drawn on the Debtors' accounts on account of the General Unsecured Claims, whether such checks were presented prior to or after the Petition Date, or (2) authority to issue new checks if such checks have not been paid, when necessary.

65.     In an effort to engender confidence among their employees, suppliers, and customers, the Debtors have publicly stated their intent to seek the relief sought in this Pass-Through Motion. The relief sought is intended to help provide for a "seamless" transition through bankruptcy while the restructuring under the Plan is consummated.

66.     A prompt conclusion to the Debtors' Chapter 11 Cases, which is contemplated in the Debtors' various agreements entered into in conjunction with the Plan, may be jeopardized if there is a disruption in the Debtors' ability to obtain products or services from their vendors and suppliers as a result of the their inability to pay their General Unsecured

Claims in the ordinary course of business. The commencement of the Debtors' Chapter 11 Cases may cause many of the Debtors' creditors to evaluate their business and creditor relationships with the Debtors. Such concerns will impact the Debtors' businesses. The Debtors desire to assuage the fears of their creditor constituency by substantially minimizing the effects of the Debtors' Chapter 11 Cases on these parties. Their efforts in this respect will be thwarted if they are not permitted to honor their prepetition obligations.

67.     Furthermore, under the Plan, the Debtors propose to pay their General Unsecured Claims in full. The Plan does not impair the General Unsecured Claims. The relief requested in the Pass-Through Motion is consistent with the treatment of the General Unsecured Claims in the Plan. Payment of such claims in the ordinary course of the Debtors' business merely accelerates the distribution that the holders of such claims would receive upon consummation of the Plan. This would prevent any harm to the Debtors' businesses and relationship with their creditors, vendors, suppliers and consultants.

68.     In contrast, if the Pass-Through Motion is not granted, the Debtors' relationships with customers and suppliers could be damaged, some irreparably so, and the agreements that the Debtors' have reached with their constituents under the Plan may be jeopardized. Accordingly, the Debtors submit that the relief requested herein is in the best interests of their estates and creditors.

69.     Nothing contained in the Pass-Through Motion is intended or should be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of

the Debtors' rights to dispute any claim; or (c) an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code.

70.    I submit that any order granting such relief is in the best interest of the Debtors, their estates, and any other parties-in-interest.

## M.    Motion for Order Under 11 U.S.C. §§ 105(a) and 363 Authorizing, But Not Directing, the Provisional Payment in the Ordinary Course of Business of Certain Prepetition Claims of Essential Trade Creditors[6]

71.    By this motion, the Debtors seek to pay prepetition claims of Essential Trade Creditors (defined below). The Debtors purchase a variety of goods and services from domestic and foreign vendors who are unaffiliated with the Debtors (the "Essential Trade Creditors").[7] If the Debtors were to lose the relationships with these Essential Trade Creditors, their ability to generate future revenue would suffer. The Debtors' obligations to these Essential Trade Creditors include, among other things, obligations owed to suppliers of finished goods sold into retail markets, and suppliers of raw materials or components used to produce finished goods sold into retail or builder trade channels.

72.    The Debtors have limited discretion to choose the suppliers for which they purchase goods for their ultimate customers. Certain of their vendors are the sole competitive, capable source of such goods, certain of their vendors supply goods that must meet stringent product design and governmental requirements, and certain of their vendors supply products to

---

[6]    The Debtors filed, contemporaneously herewith, the Debtors' Motion Seeking Entry of an Order Authorizing the Debtors to Pay Prepetition General Unsecured Claims in the Ordinary Course of Business (the "Pass-Through Motion"). The Pass-Through Motion duplicates the relief requested herein. As a result, if the Pass-Through Motion is granted the Debtors reserve the right (and currently intend to) withdraw this Motion.

[7]    The Debtors only seek authority to pay prepetition claims of the Essential Trade Creditors who are third-party creditors of the Debtors. The Debtors do not, by this Motion, seek authority to pay prepetition claims of the non-debtor subsidiaries or affiliates.

specific standards that finding an alternative supplier would be time consuming and expensive. Loss of the Essential Trade Creditors could cause future revenues or profits of the Debtors to suffer.

73.     Because the Essential Trade Creditors provide their goods to the Debtors at favorable costs and on beneficial payment terms, replacing them would likely result in higher costs for the Debtors in terms of cost of goods purchased and the cost of funds used to purchase such goods. If the Debtors can benefit from maintaining lower costs of goods purchased during the postpetition period, it is prudent for the Debtors to pay selected Essential Trade Creditors some of their prepetition claims, provided that such vendors continue to sell their goods at the same competitive prices and on at least as favorable terms postpetition as were in effect during the prepetition period.

74.     Accordingly, it is essential that the Debtors be permitted to pay selected Essential Trade Creditors, some (but not all) of which are described below, in order to continue the Debtors' businesses and to honor their contractual commitments to their customers.

75.     The Debtors use various raw materials to produce their products. In order to maintain certain quality levels, the Debtors require various grades of each raw material and large quantities of certain materials. Alternate sourcing is not practically available for certain of these products, and where available, would result in significant initial expenditures and lengthy delays because such materials are not easily obtained, especially in the quantities demanded by the Debtors. These delays would result in a significant interruption in shipments to key customers and irreparable damage to customer relationships.

76. The Debtors rely on various machines and equipment to manufacture its products and certain service providers who help maintain the machines and equipment. The Debtors need replacement parts or service on the machines and equipment. Without such support, the Debtors would be unable to operate the machines and equipment. Replacement parts or components are difficult to obtain outside the Debtors' current suppliers because the parts are highly specialized parts; furthermore, the Debtors rely on certain service provider's expertise in repairing the machines and equipment. Any delay in obtaining replacements parts or components or in paying for the service of the machines and equipment would cause significant interruption in shipments to key customers and irreparable damage to customer relationships.

77. The Debtors rely on certain service providers who contribute to create products to comply with a customer's requirements. The Debtors' products go through rigorous testing by the Debtors' customers, and various customers dictate requirements for these parts, including, but not limited to, specific finishing, heat treating, and painting. The Debtors out-source some of these services to various vendors who meet the customers' requirements. Without these additional services, the parts would be useless to customers. If the Debtors were unable to treat these service providers as Essential Trade Creditors, these service providers would no longer supply these services to the Debtors, causing delay while the Debtors attempted to find qualified replacement providers who meet the customers' requirements, causing significant interruption in shipments to key customers and irreparable damage to customer relationships.

78.     For the Debtors to continue their operations and remain competitive in the marketplace, certain critical prepetition obligations must be paid to certain creditors. By this Motion, and pursuant to sections 105 and 363 of the Bankruptcy Code and the "necessity of payment" doctrine, the Debtors seek limited discretionary authority to pay certain prepetition trade claims, as that term is defined in section 101(5) of the Bankruptcy Code (the "Trade Claims") of the Essential Trade Creditors, up to an aggregate amount of $8,100,000.00 (the "Trade Claims Cap").[8]

79.     In determining the amount of the Trade Claims Cap, the Debtors carefully reviewed all of their suppliers to determine which suppliers (i) were sole source suppliers in the categories described above without whom the Debtors could not continue to operate, (ii) could not be timely replaced on terms as beneficial to the Debtors as those already in place, (iii) were highly dependent on the Debtors' business, or (iv) would cause the future revenues or profits of the Debtors to suffer if their relationships with the Debtors were terminated. After determining this information, the Debtors estimated the amount that they believe would be required to pay to ensure the continued supply of critical goods and services. The Trade Claims Cap represents this estimated amount. Significantly, the cap does not represent the total amount of the prepetition trade claims of all Essential Trade Creditors. Rather, it represents the Debtors' best estimate as to how much can be paid, at a minimum, to such Essential Trade Creditors to continue the supply

---

[8]     The Domestic Trade Claims Cap does not include amounts owed for prepetition claims that the Debtors have authority to pay under other motions filed with this Court.

of critical goods and services. The Debtors reserve the right to seek authority from the Court to increase the Trade Claims Cap as the need arises during the pendency of the Chapter 11 Cases.

80.     The Trade Claims Cap represents approximately 47.6% of the Debtors' estimate of the aggregate prepetition unsecured claims of Debtors, which total approximately $17,000,000.00. To minimize the amount of payments required, the Debtors request authority, in their discretion, to determine the identity of Essential Trade Creditors during the postpetition period. Identifying the Essential Trade Creditors now would likely cause such vendors to demand payment in full. When determining during the postpetition period whether a creditor is an Essential Trade Creditor, the Debtors will consider, among other things: (a) whether the goods or services the creditor provides can be replaced; (b) whether failure to pay prepetition trade claims will require the Debtors to incur higher costs for goods or services postpetition; and (c) whether failure to pay prepetition trade claims will cause the Debtors to lose sales, future revenue or profits.

81.     The Debtors propose to pay the Trade Claims of each Essential Trade Creditor that agrees to continue to supply goods or services to the Debtors on such Essential Trade Creditor's Customary Trade Terms. As used herein, "Customary Trade Terms" means, with respect to an Essential Trade Creditor, (a) the trade terms and practices (including allowances) in effect between such Essential Trade Creditor and the relevant Debtor as of the Petition Date, or (b) such other trade terms as agreed by the relevant Debtor and such Essential Trade Creditor.

82.     However, as noted above, in determining the Trade Claims Cap, the Debtors included only such payments that the Debtors, in their best estimate, determined would be required to continue the supply of critical goods and services postpetition.  Thus, it may be necessary to pay certain Essential Trade Creditors only a portion of such creditors' claim in return for the continued supply of critical goods and supplies even if not on the Essential Trade Creditor's Customary Trade Terms.  The Debtors thus seek approval to enter into a separate agreement, at the Debtors' discretion, with each such Essential Trade Creditor, on a case-by-case basis.

83.     If an Essential Trade Creditor later refuses to continue to supply goods to the Debtors on Customary Trade Terms during the pendency of the Chapter 11 Cases (or on such other terms as were individually agreed to between the Debtors and such Essential Trade Creditor), then the Debtors may, in their sole discretion, and without further order of the Court, declare that (i) any payment, on account of a Trade Claim, made by the Debtors under the order granting this Motion shall be deemed to be a postpetition advance that the Debtors may recover from such Essential Trade Creditor in cash or in goods, and (ii) upon any such recovery by the Debtors, the Trade Claim of such Essential Trade Creditor paid after the Petition Date shall be reinstated in the amount so recovered.

84.     One or more Essential Trade Creditors may seek to obtain mechanics or similar state law trade liens (a "Trade Lien") on the Debtors' assets based on the Trade Claims of such an Essential Trade Creditor.  As a further condition for receiving payment on a Trade Claim, an Essential Trade Creditor must agree to take whatever action is necessary to remove

any such Trade Lien. Moreover, the Essential Trade Creditor must agree not to file or otherwise assert against any or all of the Debtors, their estates or any other affiliated person or entity or any of their respective assets or property (real or personal), any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to that Essential Trade Creditor by the Debtors arising from any agreements entered into prior to the Petition Date. In addition, to receive payment on a Trade Claim, an Essential Trade Creditor must also agree that it will not require a lump sum payment upon confirmation of a plan in the Chapter 11 Cases on account of any administrative expense priority claim that it may assert. Instead, such an Essential Trade Creditor must agree that all such claims will be paid in the ordinary course of business after confirmation of a plan under applicable Customary Trade Terms if the plan provides for the ongoing operations of the Debtors.

85. The Debtors reserve the right to make all payments under this motion in accordance with the terms of the order on this motion. The Debtors also reserve their right to obtain written acknowledgment of the Customary Trade Terms of an Essential Trade Creditor before paying such creditor's Trade Claim. If the Debtors request such acknowledgment, they may rely upon a confirming memorandum setting forth the Customary Trade Terms, whether received by facsimile, telegram, express mail, or by other customary modes of delivery. For those Essential Trade Creditors who have agreed to ship on other than Customary Trade Terms, the Debtors reserve the right to obtain written acknowledgment of such terms on a case-by-case

basis. The Debtors also reserve their right to contest any invoice of an Essential Trade Creditor under applicable non-bankruptcy law.

86.     In the aggregate, payments to Essential Trade Creditors shall not exceed the Trade Claims Cap, unless otherwise authorized by the Court. The Debtors shall maintain a matrix summarizing for the period after the Petition Date: (a) the name of each Essential Trade Creditor paid on account of Trade Claims; (b) the amount paid to each Essential Trade Creditor on account of Trade Claims; and (c) the goods or services provided by such Essential Trade Creditor. In addition, upon request, the Debtors agree to make this matrix available for review by the United States Trustee, counsel to the Prepetition and Postpetition Lenders, and counsel for any committees appointed by the United States Trustee.

87.     The Debtors believe that payment of Trade Claims owed to Essential Trade Creditors is critical to a successful reorganization. If this Motion is not granted, Essential Trade Creditors will have no incentive to continue to finance the Debtors on customary trade terms. Indeed, some Essential Trade Creditors who suspected that the Debtors were contemplating filing bankruptcy petitions have required the Debtors to pay for their goods on a cash-in-advance or cash-on-delivery basis and on shortened and less favorable terms. Any further expansion of these activities by other Essential Trade Creditors would be detrimental to the Debtors, their estates, and their creditors.

88.     The continued availability of trade credit in amounts and on terms consistent with those that the Debtors enjoyed prepetition is clearly advantageous to the Debtors because it allows the Debtors to maintain liquidity for operations and permits the Debtors to take

advantage of favorable trade terms that existed prior to the Petition Date. Preserving working capital through the retention or reinstatement of traditional trade credit terms will enable the Debtors to maintain their competitiveness and maximize the value of their businesses. Conversely, a deterioration of trade credit and a disruption or cancellation of deliveries of goods would destroy the Debtors' operations and undermine their ability to reorganize. Additionally, the relief requested herein may help to avoid the filing of countless reclamation claims, suits and motions. Avoiding the time and expense of evaluating and litigating such claims will benefit the Debtors, their estates and their creditors.

89.     Failure to pay prepetition Trade Claims owed to Essential Trade Creditors would damage the Debtors, their estates, their creditors and other parties in interest. The Debtors would lose an inexpensive and existing source of financing. Indeed, failure to pay prepetition Trade Claims may result in Essential Trade Creditors ceasing to do business with the Debtors. Either of these occurrences could prolong the Chapter 11 Cases and severely jeopardize the Debtors' reorganization.

90.     I submit that any order granting such relief is in the best interest of the Debtors, their estates, and any other parties-in-interest.

**N.     Motion for Entry of an Order Authorizing the Debtors to Honor
        Pre-Petition Obligations to Customers and to Otherwise Continue
        Customer Programs and Practices in the Ordinary Course of Business[9]**

91.     The Debtors move the Court for an order authorizing the Debtors to honor

prepetition obligations to customers and to otherwise continue customer programs and practices

in the ordinary course of the Debtors' businesses. In the ordinary course of their businesses, the

Debtors engage in certain practices designed to develop and sustain a positive reputation in the

marketplace for their goods and services. Among these practices are warranty programs, supply

and inventory agreements and other similar programs, practices and commitments directed at

customers (collectively, the "Customer Programs"). The common goals of the Customer

Programs have been to meet competitive pressures, insure customer satisfaction and generate

goodwill for the Debtors – thereby retaining current customers, attracting new customers, and

ultimately enhancing revenues.

92.     The great majority of the Customer Programs constitute operating

practices that are provided to customers under existing purchase orders and contracts, which are

likely executory contracts under the Bankruptcy Code. The Debtors anticipate that they will

ultimately seek to assume all or substantially all of the underlying contracts and, as a result,

believe that it is the most prudent and cost-efficient course of action to insure that the Debtors

continue to perform under such contracts. Moreover, many of the Customer Programs will not

arise until after the Petition Date and arguably constitute ordinary course expenditures of the

Debtors. However, out of an abundance of caution, and to give its customers assurances that the

---

[9]  The Debtors filed, contemporaneously herewith, the Debtors' Motion Seeking Entry of an Order Authorizing the
Debtors to Pay Prepetition General Unsecured Claims in the Ordinary Course of Business (the "Pass-Through
Motion"). The Pass-Through Motion duplicates the relief requested herein. As a result, if the Pass-Through
Motion is granted the Debtors reserve the right (and currently intend to) withdraw this Motion.

Customer Programs will be continued, the Debtors are pursuing relief to the extent that the Customer Programs, as they relate to pre-petition agreements, orders, and sales of the Debtors' products and services, may represent unperformed obligations of the Debtors and may evidence pre-petition claims against the Debtors.

93.     By this Motion, the Debtors respectfully request entry of an order pursuant to sections 105(a), 363(c), 1107(a) and 1108 of the Bankruptcy Code, authorizing the Debtors, in their business judgment, (a) to perform and honor their pre-petition obligations related to the Customer Programs as they see fit, and (b) to continue, renew, replace, implement new, and/or terminate such of the Customer Programs as they see fit, in the ordinary course of business, without further application to the Court. The Debtors estimate that the aggregate cost of performing their obligations in regard to the Customer Programs which are not provided to customers under the terms of existing contracts will be approximately $4 million, which is the expected cost of the Warranty Program (as defined in this Motion) over the next year, which is relatively de minimis in light of the substantial benefit to the Debtors of continuing the Customer Programs as set forth in the Motion. The Debtors do not believe that the Supply Agreements or Inventory Agreements impugn any charges to the estate.

94.     The Debtors seek to continue the Customer Programs because they are successful and the programs are normal industry business practices, which in the past have generated valuable goodwill, repeat business and net revenue increases. Maintaining these benefits throughout the Chapter 11 Cases is essential to the continued vitality of the Debtors' businesses, and ultimately to their prospects for a successful reorganization. The Debtors believe

that the bankruptcy filing itself could negatively influence customers' attitude and behavior toward their services unless the Debtors can take the measures requested by this Motion to alleviate customer concerns. In particular, the Debtors' goodwill and ongoing business relationships may erode if their customers perceive that the Debtors are unable or unwilling to fulfill the pre-petition promises they have made through the Customer Programs. The same is true if customers were to perceive that the Debtors will no longer be offering the full package of services, or quality of services, expected by their customers.

95.     The Debtors desire to continue during the post-petition period those Customer Programs that were beneficial to their businesses and cost-effective during the pre-petition period. Such relief is necessary during the post-petition period to preserve the Debtors' critical business relationships and goodwill for the benefit of the estates. For these and for the other reasons set forth herein, it is in the best interests of the Debtors, their estates and their creditors to honor pre-petition obligations of the Customer Programs and to continue the Customer Programs as they see fit in the ordinary course of business.

96.     I submit that any order granting such relief is in the best interest of the Debtors, their estates, and any other parties-in-interest.

## O.    Motion for Authority to Pay in the Ordinary Course of Business Prepetition Claims Related to Shipping Charges[10]

97.     The Debtors move the Court for entry of an order authorizing the Debtors to pay certain prepetition claims related to shipping charges. The Debtors have a reputation for

---

[10]  The Debtors filed, contemporaneously herewith, the Debtors' Motion Seeking Entry of an Order Authorizing the Debtors to Pay Prepetition General Unsecured Claims in the Ordinary Course of Business (the "Pass-Through Motion"). The Pass-Through Motion duplicates the relief requested herein. As a result, if the Pass-Through Motion is granted the Debtors reserve the right (and currently intend to) withdraw this Motion.

reliability and dependability among their customers. Many of the Debtors' pricing policies and marketing strategies revolve around their reliability and dependability. This reputation depends in substantial part on the timely delivery of product to the Debtors' customers. In turn, the Debtors' ability to make timely deliveries depends on a successful and efficient system for receipt of raw materials, parts and components used in the Debtors' operations. This supply and delivery system involves the use of reputable domestic and international common carriers, shippers and truckers (collectively, the "Shippers"), a network of warehouses and yards, and professional customs brokers and freight forwarders. Timely and efficient clearance of the Debtors' goods through customs is also a vital component of the Debtors' supply and delivery system. Thus, it is essential for the Debtors' continuing business viability, as well as the value of their estates, that they maintain a reliable and efficient distribution system.

98.     Because the Debtors are in many cases dependent on third parties, it is essential that these Chapter 11 Cases not be a reason or excuse for any third party to cease performing timely services. The Debtors' continuing business viability and the Debtors' efforts to maximize value for creditors depend on the Debtors' ability to maintain a reliable and efficient distribution system. For example, if the Debtors are unable to receive deliveries of raw materials or supplies on a timely and uninterrupted basis, their manufacturing operations will be impeded within a matter of hours, thereby causing irreparable damage to their businesses. Similarly, if the Debtors are unable to provide finished goods to customers on a timely basis, the Debtors will likely suffer a significant loss of credibility and customer goodwill, thereby causing substantial harm to the Debtors' businesses and their reorganization efforts.

99.     By this Motion, the Debtors seek to prevent the breakdown of their shipping network. They request authority to pay (a) certain prepetition claims related to shipping as, in their business judgment, the Debtors determine is necessary or appropriate to (i) obtain release of critical or valuable goods detained in transit pending payment, (ii) maintain a reliable, efficient and smooth distribution system and (iii) induce critical shippers to continue to carry goods and make timely delivery and (b) continue to pay on a postpetition basis Shippers and Warehousemen (as defined herein) in the ordinary course of business as they become due.

100.    The Debtors have a broad national presence with manufacturing, sales and distribution facilities in several locations throughout the United States. The Shippers ship, transport, store and deliver raw materials, as well as parts and components, to the Debtors at their various facilities and deliver the Debtors' finished products to their municipal and industrial customers all over the country. Goods which are in transit are sometimes deposited into warehouses or yards that do not belong to the Debtors, but rather to independent third parties (the "Warehousemen").

101.    Under the laws of some states, a carrier or a warehouseman may have a lien on the goods in its possession which secures the charges or expenses incurred in connection with the transportation or storage of the goods. In addition, pursuant to section 363(e) of the Bankruptcy Code, a carrier or a warehouseman, as a bailee, may be entitled to adequate protection of a valid possessory lien. The Shippers and the Warehousemen will likely argue that they are entitled to possessory liens for transportation and storage, as applicable, of the goods in

their possession as of the Petition Date and may refuse to deliver or release such goods before their claims have been satisfied and their liens redeemed.

102.     In addition, the Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices for goods that were delivered to the Debtors or the Debtors' customers prior to the Petition Date (the "Shipping and Warehousing Charges"). If the Debtors do not pay these Shipping and Warehousing Charges, certain of the Shippers will discontinue services and withhold shipment of essential goods.

103.     Dalton Corporation handles all shipping for the various Dalton manufacturing facilities. A portion of Dalton Corporation's outstanding shipping charges are owed to Traffic Management, a freight clearinghouse ("Traffic"). Dalton forwards all of its shipping invoices to Traffic, who pays all the Shippers on the invoices. In turn, Dalton then wires one payment to Traffic to cover the invoices.

104.     The value of the goods in the possession of the Shippers and Warehousemen and the potential injury to the Debtors if the goods are not released are likely to greatly exceed the amount of such Shipping and Warehousing Charges. The Debtors, thus, believe that it is necessary and essential to the value of their estates that they be permitted to make payments on account of certain Shipping and Warehousing Charges.

105.     Accordingly, by this Motion, the Debtors seek an order authorizing them, inter alia, to make payments to the Shippers and Warehousemen as the Debtors, in their business judgment, determine is necessary or appropriate in order to obtain the release of the goods held by such Shippers and Warehousemen. Such payments, as reflected by the Debtors' current

recorded invoices, are anticipated to be approximately $290,000.00. In addition, the Debtors

seek to continue to pay, on a post petition basis, Shippers and Warehousemen in the ordinary

course of business as invoices become due. The Debtors seek authority to make such payments

in the amounts and to the extent necessary to satisfy non-disputed shipping and warehousing

charges and to satisfy any potential, asserted, or actual possessory liens, if any, on the goods that

may be held by a Shipper or a Warehouseman pending payment of such charges. The Debtors

represent that they will only pay Shipping and Warehousing Charges where they believe, in their

business judgment, the benefits to their estate and creditors from making such payments will

exceed (i) the costs that their estates will incur by bringing an action to compel the turnover of

such goods and (ii) the delays associated with such actions.

106.    The Debtors submit that the total amount to be paid to the Shippers and

Warehousemen if the requested relief is granted will be less than the losses the Debtors may

suffer if their operations are disrupted. Moreover, the Debtors do not believe there are viable

timely alternatives to the Shippers or the Warehousemen that they have used prior to the Petition

Date.

107.    In the course of their normal business operations, the Debtors receive

quantities of raw materials, parts and other goods from companies located overseas (the

"Imported Goods"). Timely receipt of the Imported Goods is critical to the Debtors' business

operations. Any disruption or delay in the receipt of the Imported Goods would adversely affect

the Debtors' business operations and would be detrimental to their estates.

108.    The Debtors employ several different custom brokers, as described below, to file an "entry" on behalf of the relevant Debtor and pay the custom duties ("Entry Payment") when Imported Goods arrive in the United States. The Debtors pay approximately $19,500.00 annually in customs duties. It is imperative that the Debtors' customs brokers, as the Debtors' agents, continue to have the authority to make Entry Payments to the United States Customs Service (the "Customs Service") even if the Debtors incurred liability for the relevant entries prior to the Petition Date. If such Imported Goods are not redelivered to the Customs Service, the Customs Service may detain future deliveries of the Imported Goods, as well as implement various sanctions against the Debtors, including fines. If the Imported Goods remain in the custody of the Customs Service for, generally, over forty-eight (48) hours, the relevant Debtor will be charged for the storage of such Imported Goods. Therefore, it is imperative that the Debtors be able to pay their custom brokers so that the Debtors will continue to receive the Imported Goods without delay to ensure continuous manufacturing operations and to avoid paying significant amounts in storage fees.

109.    After the Entry Payment is made and the Imported Goods are delivered to the Debtors, an import specialist at the Customs Service reviews the documents submitted by the respective Debtor's agent and determines whether the amount of the Entry Payment was correct. If such specialist determines that further duty amounts are owed, an additional amount is assessed and a bill "at liquidation" (i.e., the final computation of the duties accruing on an entry) is issued. Such liquidation amount (the "Liquidation Payment" and, together with the Entry Payment, the "Customs Duties") is then payable by the Debtors' customs broker.

110.    It is essential that the assessed Liquidation Payments are made promptly
by the Debtors' agents. If such duties remain unpaid, the Customs Service will assess interest
charges and may impose sanctions against the Debtors. Such sanctions may include denial of
importing privileges and/or substantial monetary penalties. At a minimum, the Customs Service
is likely to demand that all Imported Goods be paid on a "cash before receipt" basis. Such a
demand will unnecessarily result in substantial delay in the receipt by the Debtors of the
Imported Goods and increased storage charges by the Customs Service.

111.    In addition, the Debtors have posted a $600 bond to secure payment of
their obligations to the Customs Service. If this occurs, the Debtors would be required to post a
new bond to secure their obligations at significant additional cost.

112.    As a consequence of the complexity of the U.S. and foreign customs laws
and regulations and the dire consequences that can befall an importer for failure to follow these
laws strictly, it is customary for importers to use the services of professional customs brokers and
freight forwarders as agents for the importer. The Debtors use the services of multiple customs
brokers and freight forwarders (collectively, the "Customs Brokers"). The Customs Brokers are
a vital link in the Debtors' chain of supply: they complete paperwork necessary for customs
clearance, prepare import summaries and obtain tariff numbers and perform numerous other
miscellaneous services for the Debtors. Most important, the Customs Brokers advance funds on
behalf of the Debtors to pay Customs Duties, as well as the charges of certain ocean, air and land
Shippers and certain miscellaneous storage and handling expenses (collectively, the
"Advances").

113.     The Debtors also pay the Customs Brokers for their services (the "Brokers Fees"). The Customs Brokers submit invoices to the Debtors for both the Advances and the Brokers Fees.  Generally, the Customs Brokers receive payment from the Debtors one or two weeks after receipt of the invoices.

114.     As of the Petition Date, certain of the Custom Fees, Advances and Brokers Fees for prepetition services have not been paid by the Debtors.  The amount of such outstanding Custom Duties, Advances and Brokers Fees, including the estimated Entry Payment due for goods currently in transit as reflected by invoices received by the Debtors, is approximately $175.00 in the aggregate.

115.     The Debtors believe that they must pay the Brokers Fees and Advances to prevent any disruption in their current arrangement with the Customs Brokers and in the essential services they provide.  The Debtors also believe it is imperative that they be able to continue to pay the Customs Brokers on a postpetition basis all Brokers Fees and Advances incurred in the ordinary course of business as they become due.  The Customs Brokers may refuse to make further Advances if the outstanding Advances and Brokers Fees remain unpaid.  This would lead to a disruption of the Debtors' supply network, and will have the adverse consequences described above.

116.     Unpaid customs brokers have been known to cloud title to imported goods by asserting liens on the goods for unpaid fees and advances.  Even if the Customs Brokers could be replaced with customs brokers willing to perform the same services, there is no guarantee that

the services would be available either timely or on terms as favorable as those the Debtors enjoy currently. The Debtors, thus, would lose an inexpensive, pre-existing source of financing.

117.    I submit that any order granting such relief is in the best interest of the Debtors, their estates, and any other parties-in-interest.

P.    **Motion for Order (a) Authorizing the Debtors to Pay Prepetition Sales, Use and Franchise Taxes, and (b) Authorizing Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay Checks Presented for Payment Related Thereto**[11]

118.    The Debtors move the Court for entry of an order (a) authorizing the Debtors to pay sales, use and franchise taxes and such other taxes as the Debtors, in their discretion, deem necessary, and (b) authorizing applicable banks and other financial institutions to receive and process, honor and pay all checks presented for payment related thereto. By this Motion, the Debtors seek authority to pay, in their sole discretion, certain Taxes (as defined below) to the relevant Authorities (as defined below) in the ordinary course of business. Nothing herein, however, shall preclude the Debtors from contesting, in their sole discretion, the validity and amount of the Taxes.

119.    In connection with the normal operation of their businesses, the Debtors incur use, franchise, and other taxes and collect sales taxes from their customers (collectively, the "Taxes") on behalf of various taxing and licensing authorities (collectively, the "Authorities") for payment to such Authorities. The Debtors pay Taxes to the various Authorities on a monthly, quarterly or yearly basis, depending on the particular Tax.

---

[11]    The Debtors filed, contemporaneously herewith, the Debtors' Motion Seeking Entry of an Order Authorizing the Debtors to Pay Prepetition General Unsecured Claims in the Ordinary Course of Business (the "Pass-Through Motion"). The Pass-Through Motion duplicates the relief requested herein. As a result, if the Pass-Through Motion is granted the Debtors reserve the right (and currently intend to) withdraw this Motion.

120. In an abundance of caution, the Debtors seek the relief requested hereunder in the event, and to the extent that, any Taxes accrued pre-petition were not in fact paid pre-petition, paid in an amount that is less than is actually owed, or if any payments sought to be made pre-petition are rejected, lost or otherwise not received in full by any Authorities. The Debtors estimate that the total amount of Taxes actually due pre-petition and not yet paid is approximately $130,000. This amount represents a very small fraction of the Debtors' total assets.

121. The Debtors also seek authority to pay any Taxes imposed for pre-petition business activities. Currently the IRS is conducting an audit of the Debtors' 1999 through 2002 financial statements (the "Investigation"). The Debtors are uncertain about the amount of Taxes that may arise from the Investigation or even whether any Taxes will be imposed. If these Taxes are levied, they likely would be given administrative priority, so the Court's grant of authority to pay these claims only changes the timing of the payment. To ensure the Debtors' smooth transition through the restructuring process, the Debtors seek authority to pay any and all Taxes imposed by the IRS in the Investigation without further court approval.

122. The Debtors believe that the failure to pay the Taxes could have a material adverse impact on their ability to operate in the ordinary course of business. The Debtors operate a transactional business, and many disputes which could impact their ability to conduct business in a particular jurisdiction could have a wide-ranging effect on the Debtors as a whole. Furthermore, the Debtors believe that some, if not all, of the Authorities may cause the Debtors to be audited if certain of the Taxes are not paid forthwith. Such audits will unnecessarily divert

the Debtors' attention away from the operations of their businesses and the reorganization process.

123.     I submit that any order granting such relief is in the best interest of the Debtors, their estates, and any other parties-in-interest.

**Q.      Motion for Order Authorizing the Debtors to (a) Obtain Post-Petition Financing of Insurance Premiums and Renewals Thereof, and (b) Pay Prepetition Premiums, if any, Necessary to Maintain Insurance Coverage in Current Effect**

124.     The Debtors move the Court for entry of an order authorizing the Debtors to (a) obtain post-petition financing of insurance premiums and renewals thereof, and (b) pay pre-petition premiums, if any, necessary to maintain insurance coverage in current effect.  In the ordinary course of the Debtors' business, the Debtors maintain numerous insurance policies providing coverage for, inter alia: general liability, worker's compensation, property, foreign liability, fiduciary liability, umbrella liability, automobiles and trucks, crime and extortion, kidnap/ransom, directors and officers liability, employment practices and inland marine/cargo (the "Policies").  A list of the Policies is attached to the motion.  These Policies are essential to the preservation of the Debtors' businesses, properties and assets, and, in many cases, such insurance coverages are required by various regulations, laws and contracts that govern the Debtors' business conduct.

125.     Since these Policies are essential to the Debtors' businesses and restructuring, the Debtors believe it is in the best interests of their estates to permit the Debtors to honor their obligations under the current insurance contracts.  Any other alternative would likely

require considerable additional cash expenditures and would be detrimental to the Debtors'
reorganization efforts.

126.    The Debtors' ability to continue making payments without any lapse is
especially essential for the Policies that are paid monthly.  Currently the Debtors pay their
general liability, vehicle (autos, pickups, tractors and trailers) and workers' compensation
premiums on a ten (10) month basis paid in equal monthly installments from January through
October (collectively, the "Monthly Policies").  The Debtors do not pay any additional financing
charge for this payment system.  Even a temporary suspension of the Debtors' ability to pay
these Monthly Policies would create a significant risk of the Debtors losing their insurance
coverage.

127.    Moreover, because most of the remaining insurance policies expire
annually, the Debtors seek authority to renew their Policies or enter into new Policies on
competitive terms without further Court approval.  As the time for payment and renewal of these
policies arrives at different times of the year, the Debtors may not be able to renew these Policies
on time and could be forced to pay higher rates and/or expend money to acquire a new provider.
As the Policies must be renewed at different times, the Debtors would be forced to appear in
Court continuously to renew their Policies, a procedure that would impose an extraordinary
burden on the Debtors' estates and restructuring efforts.

128.    To assist in the purchase and maintenance of new Policies, the Debtors
employ a risk management consultant (the "Consultant").  The Consultant works with the
Debtors' management to ascertain the correct policies for each Debtor.  With this information,

the Consultant recommends the best policy for the Debtors, both in terms of price and coverage. Employing the Consultant has also allowed the Debtors to avoid spending unnecessary time and resources searching for new insurance policies. Moreover, the Consultant's services eliminate any need for the Debtors to employ a risk manager. By using the Consultant, the Debtors can acquire the necessary insurance policies at competitive prices while saving any unnecessary use of the Debtors time and resources.

129. Clearly, the Debtors will need to continue their Policies and the employment of the Consultant throughout the duration of these Chapter 11 Cases. The Debtors respectfully suggest that the renewal or negotiation of these Policies, as well as the employment of the Consultant,[12] fall squarely within their ordinary course of business and, but for the constraints of section 364 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to enter into insurance contracts or employ agents to assist them in purchasing and maintaining their Policies. To reduce the administrative burden of these Chapter 11 Cases, as well as the expense of operating as debtors in possession, the Debtors seek the Court's authority now to renew their Policies or enter into new Policies at the conclusion of the term of the current Policies. The Debtors also request the ability to continue employing the Consultant or contract with a new Consultant without prior Court approval.

130. By this Motion, the Debtors also propose to pay any pre-petition premiums related to the Policies to the extent that the Debtors determine, in their discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment,

---

[12] The Consultant is an Ordinary Course Professional pursuant to Motion for Order Authorizing the Debtors to Employ and Compensate Certain Professionals Utilized in the Ordinary Course of the Debtors' Business.

lapse or any form of impairment to the coverage, benefits or proceeds provided under the Policies. Although the Debtors are not presently aware of any such premium obligations or the necessity of such payment, the Debtors seek this authority out of an abundance of caution, in recognition of the critical necessity of keeping their insurance policies in current effect, and out of concern that if the necessity for such a payment arises in the future, the passage of time while the Debtors seek and obtain the Court's authority for such a payment may have irreversible adverse consequences for the Debtors' coverage under the Policies.

131.    The Debtors have determined in their business judgment that it is not economically advantageous for the Debtors to pay the premiums for their property insurance (the "Property Insurance") on an annualized basis. Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the premiums on the Property Insurance policy pursuant to a premium financing agreement ("PFA") with Premium Financing Specialists, Inc. ("PFS"), a third-party lender. A copy of the current PFA for the Property Insurance policy is attached to the motion as Exhibit B (the "Existing PFA").

132.    The Existing PFA presently requires monthly installment payments of $44,391.00 due on the first day of each month for nine months beginning on July 1, 2003. The Existing PFA bears a total finance charge of $5,356.84 on the total financed amount of $394,160. The annual interest rate under the Existing PFA is 3.25%.

133.    If the Debtors are unable to continue making payments on the Policies, the PFS under the Existing PFA may be permitted to terminate the Property Insurance policies to recoup their losses. Furthermore, if the Debtors are unable to continue making payments on the

Property Insurance policies, the insurance companies may not allow the Debtors to renew these policies at the current rates in the future. The Debtors would then be required to obtain replacement insurance on an expedited basis and at tremendous cost to the estate. Even if the insurance companies were not permitted to terminate the Property Insurance policies, any interruption of payments would have a severely adverse effect on the Debtors' ability to extend current Property Insurance policies or acquire new insurance coverage in the future.

134. By this Motion, the Debtors propose to continue to finance the premiums for the Property Insurance policy throughout these bankruptcy cases by continuing the Existing PFA, entering into new PFAs, and/or renewing the Existing PFA in the ordinary course of business, without the need for further authority or approval of the Court.

135. In view of the importance of maintaining the insurance coverage with respect to its business activities and the preservation of the Debtors' cash flow and estate by financing the insurance premiums, the Debtors believe it is in the best interests of their estates to authorize the Debtors to honor their obligations under the Existing PFA. Any other alternative would likely require considerable cash expenditures and would be detrimental to the Debtors' reorganization efforts.

136. Moreover, because the Existing PFA expire on an annual basis, the Debtors seek authority to renew their Existing PFA or to enter into new PFAs on competitive terms and conditions without further Court approval. Clearly, the Debtors will need to continue their insurance coverage throughout the entire duration of these bankruptcy cases. The Debtors respectfully suggest that the renewal or negotiation of PFAs falls squarely within the ordinary

course of business and, but for the constraints of section 364 of the Bankruptcy Code, the

Debtors would not need the Court's prior approval to enter into new premium financing

agreements. To reduce the administrative burden of these cases, as well as the expense of

operating as debtors in possession, the Debtors seek the Court's authority now to renew their

Existing PFA or to enter into new PFAs at the conclusion of the term of the Existing PFA and

seek an order that provides that if the Debtors renew PFA or enter into new PFAs.

137. I submit that any order granting such relief is in the best interest of the

Debtors, their estates, and any other parties-in-interest.

**R. Motion for Order Under 11 U.S.C. §§ 105, 345, 363, 364(C)(1), 1107 and 1108 (A) Authorizing (i) Maintenance of Existing Bank Accounts, (ii) Continued Use of Existing Business Forms, (iii) Continued Use of Existing Cash Management System, and (iv) Continued Use of Existing Investment Practices; and (B) Granting Superpriority Status to Postpetition Intercompany Claims**

138. The Debtors move the Court for entry of an order (a) authorizing the

debtors to (i) maintain existing bank accounts, (ii) continue to use their existing business forms,

(iii) continue to use their existing cash management system, and (iv) continue to use their

existing investment practices; and (b) granting superpriority status to postpetition intercompany

claims. I have been informed by counsel that the United States Trustee for the District of

Delaware has established certain operating guidelines for debtors in possession. One such

provision requires a chapter 11 debtor in possession to open new bank accounts and close all

existing accounts. The United States Trustee Guidelines also require that new bank accounts be

opened in certain financial institutions designated as authorized depositories by the United States

Trustee. This requirement is intended to provide a clear line of demarcation between prepetition

and postpetition claims and payments. This requirement also protects against inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

139. Before the Petition Date, the Debtors maintained 23 bank accounts in the ordinary course of business in their cash management system, as well as 27 separate bank accounts used by various Debtors for payroll or other discrete purposes (collectively, the "Bank Accounts"). A list of the Bank Accounts and account numbers is attached to the motion.

140. I have been informed by counsel that pursuant to Del.Bankr.LR 1007-2(a), the Debtors seek a waiver of the United States Trustee's requirement that the Debtors close the Bank Accounts and open new postpetition bank accounts at depositories authorized by the United States Trustee. If strictly enforced in this case, the United States Trustee's requirement would cause substantial disruption in the Debtors' activities and would impair the Debtors' ability to reorganize their businesses for the benefit of their estates and parties in interest.

141. The Debtors' ability to maintain and use the Bank Accounts will significantly facilitate the Debtors' operations in these Chapter 11 Cases. To avoid delays in receipt of payments and payment of debts incurred postpetition, the Debtors should be permitted to continue to maintain the existing Bank Accounts and, if necessary, to open new accounts.

142. To guard against improper transfers resulting from the postpetition honoring of prepetition checks, instead of requiring debtors to close all of their bank accounts, courts have ordered banks, with limited court-approved exceptions, not to honor any checks drawn on Debtors' accounts before the Petition Date.

143.     A similar waiver of the account closing requirement is necessary here.
Subject to a prohibition against honoring prepetition checks or offsets without specific
authorization from this Court, the Debtors request that the Bank Accounts be deemed debtor in
possession accounts and that the Debtors be authorized to maintain and continue to use these
accounts in the same manner and with the same account numbers, styles and document forms as
those used during the prepetition period.

144.     If the relief requested herein is granted, the Debtors will not pay, and each
of its banks where the Bank Accounts are maintained will be directed not to pay, any debts
incurred before the Petition Date other than as specifically authorized by this Court.

145.     I have been informed by counsel that in other cases of this size, this Court
has waived the strict enforcement of bank account closing requirements and replaced them with
alternative procedures that provide the same protection.

146.     To minimize expense to their estates, the Debtors also request authority to
continue to use all correspondence and business forms (including, but not limited to letterhead,
purchase orders, invoices, etc.), as well as checks, without reference to their "debtor in
possession" status.

147.     Parties doing business with the Debtors undoubtedly will be aware of the
Debtors' status as chapter 11 debtors in possession from the publicity of the filing.  Changing
correspondence and business forms would be unnecessary and burdensome to the estates, as well
as expensive and disruptive to the Debtors' business operations, particularly with respect to
programming that would be necessary to alter the Debtors' check drafting software.  For this

reason, the Debtors request that they be authorized to use their respective existing checks and business forms without placing the label "debtor in possession" on each such check or form. Other courts have allowed debtors to use their prepetition forms without the "debtor in possession" label.

148. The Debtors are affiliates as that term is defined in section 101(2) of the Bankruptcy Code. As affiliated entities, the Debtors maintain a centralized integrated cash management system ("Cash Management System") in the operation of their businesses, as described further below and in the chart attached to the motion as Exhibit B.

149. The Debtors use a Cash Management System that concentrates all cash yet allows the various subsidiaries to exercise certain options within specified guidelines. The Cash Management System also enables the Debtors to avoid idle balances and lower bank service charges. The Cash Management System consists of: (i) a single concentration account where collections are aggregated from lockboxes established by the various Debtor entities to collect receivables; (ii) ten zero balance accounts maintained by the Debtor entities; and (iii) nine controlled disbursement accounts from which the various Debtor entities write checks.

150. The Debtors maintain a concentration account ("Concentration Account") with Bank One in Wisconsin. Because the Debtors have pledged their cash and accounts receivable as security to various banks and funds, the Concentration Account was established and is maintained for the benefit of Chase Manhattan Bank ("Chase"), who acts as collateral agent for the Debtors' secured lenders. Management of the Concentration Account is set forth in a Lockbox and Depository Agreement dated September 7, 2000, as amended by a November 13,

2002 First Amendment to Lockbox Depository Agreement (collectively, the "Lockbox Agreement"). All the Debtors' cash is concentrated in this account. With the permission of the secured lenders, the Debtors' accounting staff uses this account to make payments and/or advances to and from the Debtors' line of credit with Bank One.

151.    In addition, excess funds in the Concentration Account are swept by Bank One to be invested overnight in government securities. All available funds, except $300,000, are invested nightly.

152.    Each Debtor entity maintains a zero balance general account ("ZBA"). Any checks or electronic payments received from the various Debtors' operations are deposited through each Debtor's unique lockbox account, these funds are then deposited into the Debtors' respective ZBAs. The ZBAs provide funding for the Debtors' disbursement accounts (discussed below). Each day, all funds that have not been transferred to the disbursement accounts are swept into the Concentration Account, leaving an ending balance of zero in each ZBA. Each Debtor's accounting staff monitors the company's cash position and makes corresponding inter-company entries.

153.    The Debtors make payments to fund their operations from controlled disbursement accounts ("CDAs"). Each Debtor's CDA is funded by its respective ZBA. All CDA checks are drawn from Bank One's premier CDA site in Circleville, Ohio. The Debtors' accounting staff receives daily notification of each Debtors' funding requirements and funds the CDAs accordingly.

154. In addition, all the Debtors have wire transfer agreements with Bank One. Any outstanding transfers that were initiated prepetition that have not settled are to employees and critical vendors, whose claims the Debtors have sought to be given authority to pay pursuant to orders of this Court.

155. The Debtors hereby seek authority to continue using the current centralized Cash Management System. Given the size and complexity of the Debtors' operations, as well as the need to preserve and enhance their respective going concern values, a successful reorganization of the Debtors' businesses simply cannot be accomplished if there is substantial disruption in the Debtors' cash management procedures. It is essential, therefore, that the Debtors be permitted to continue to consolidate management of their cash and transfer money from entity to entity as needed and in the amounts necessary to continue the operation of their businesses.

156. The Debtors have used the basic structure of the Cash Management System described herein since September, 2000, and it constitutes the Debtors' ordinary, usual and essential business practices. The Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity. The widespread use of such systems is attributable to the numerous benefits they provide, including the ability to: (a) tightly control corporate funds; (b) invest idle cash at higher returns; (c) ensure cash availability; and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.

These controls are particularly important here given the significant amount of cash that flows through the Debtors' Cash Management System on an annual basis.

157.    In addition, given the corporate and financial structure of the Debtors, it would be difficult, if not impossible, for the Debtors to establish an entirely new system of accounts and a new cash management system for each separate legal entity. For example, if the Debtors were required to open separate accounts as debtors in possession and rearrange their Cash Management System, it would require reopening at a minimum 16 new separate bank accounts with attendant delays in the Debtors' ability to operate their businesses while pursuing these arrangements. Thus, under the circumstances, maintenance of the Debtors' Cash Management System is not only essential to the Debtors, it is also in the best interests of their respective estates and creditors (of course, the Debtors will continue to maintain strict records with respect to all transfers of cash, so that all transactions can be readily ascertained, traced and recorded properly on applicable intercompany accounts). Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Debtors' Cash Management System will facilitate the Debtors' reorganization efforts.

158.    If the Debtors are not permitted to continue to use their Cash Management System in its current form (modified to the extent necessary by the debtor in possession financing arrangements), their operations will be severely, and perhaps, irreparably, impaired. Accordingly, the Court should authorize the Debtors' continued use of their existing Cash Management System.

159. In addition, the Debtors should be granted relief from the United States Trustee Guidelines to the extent they require that the Debtors make all disbursements by check.

160. Considering the complexity of the Debtor's operations, it is necessary for the Debtors to conduct some transactions by wire transfer. To deny the Debtors the opportunity to conduct wire transfers would interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations.

161. Further, in the ordinary course of their operations, the Debtors maintain small balances of cash in petty cash accounts which funds are disbursed, supplemented and accounted for in accordance with long-standing policies. Examples of purposes for these accounts include use as a cashier fund, an insurance disbursement account, or a dental plan account. In addition, the various Debtors have set up approximately 13 payroll accounts at local banks. These payroll accounts are maintained for the benefit of employees, who may cash payroll checks and enjoy other conveniences associated with a local bank. The Court should permit these practices to continue.

162. It is critical both to the continued operation of the Debtors' businesses and to the preservation of the value of those businesses that the Debtors continue to utilize their existing Cash Management System without disruption. Accordingly, it is appropriate, and equally important, entirely consistent with applicable provisions of the Bankruptcy Code and case law, for the Court to approve the Debtors' centralized Cash Management System in its current form (except to the extent it needs to be modified in accordance with the debtor in possession financing arrangements).

163.    After the Petition Date, the Debtors intend to maintain their investments in accordance with the guidelines provided in an existing One Sweep Service Agreement with Bank One ("One Sweep Agreement"). One Sweep provides the Debtors with a safe means of obtaining a reasonable return on excess cash. A copy of the One Sweep Service Agreement is attached as Exhibit C. Pursuant to One Sweep, Bank One daily sweeps all but $300,000 in available finds from the Concentration Account, using such funds to purchase securities issued by the U.S. Treasury or other agencies of the U.S. Government ("Government Securities"). The following day, the securities are repurchased from the Debtors by Bank One, and the Concentration Account is repaid with interest.

164.    Section 345(a) of the Bankruptcy Code authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." Section 345(b) of the Bankruptcy Code requires that, generally, with respect to investments other than investments "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," the estates must require a bond in favor of the United States secured by the undertaking of a court-approved corporate surety or deposit securities of the kind specified in 31 U.S.C.§ 9303. The Bankruptcy Code allows the Court to dispense with this requirement, however, "for cause." 11 U.S.C. § 345(b).

165.    In this case, the One Sweep Agreement, which, by its terms, limits investment to Government Securities, is entirely consistent with Sections 345(a) and (b) of the Bankruptcy Code. Therefore the Debtors should be excused from all collateralization

requirements imposed by Section 345 of the Bankruptcy Code. Moreover, in light of the substantial amount of funds that will flow through these estates, it would be imprudent for the Debtors to eliminate their current investment practices.

166.    In the ordinary course of their business, the Debtors maintain business relationships, including payables for purchases and services among the Debtors. Such purchases and services are normally paid in the ordinary course of business and may include but are not limited to purchases of materials and products required for normal operations, third party payments through a centralized accounts payable system, miscellaneous consolidated payments by a parent which represent the obligations of subsidiary (e.g., tax payments, payroll transfers), intercompany cash balances among Debtors (e.g., accounts receivable and disbursements), and funding for benefit programs.

167.    Specifically, several of the Debtor subsidiaries provide important services for their parents. For example, Neenah Transport, Inc. provides freight hauling to and from Neenah Foundry Company. Similarly, A& M Specialties, Inc. provides machining services for Mercer Forge, Inc. These activities give rise to intercompany liabilities (together with the claims described in paragraph 36 above, the "Intercompany Claims").

168.    To resolve the concerns related to the repayment of funds moved between a debtor and its subsidiaries in a chapter 11 case, courts typically grant administrative and superpriority status to postpetition intercompany claims by and between the debtor entities.

169.    I submit that any order granting such relief is in the best interest of the Debtors, their estates, and any other parties-in-interest.

**S.  Motion of Debtors for Entry of an Order Authorizing the Debtors to: (A) Pay Certain Prepetition (i) Wages, Salaries, and Other Compensation, (ii) Employee Medical, Pension and Similar Benefits, (iii) Employee Severance and Retirement Benefits, (iv) Workers' Compensation Obligations, and (v) Reimbursable Employee Expenses; (B) Continue Making Deductions From Employees' Paychecks; and (C) Authorizing Financial Institutions to Pay all Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing**

170.    The Debtors seek entry of an order authorizing the Debtors to: (a) pay certain prepetition (i) wages, salaries, and other compensation, (ii) employee medical, pension and similar benefits, (iii) severance and retirement benefits, (iv) workers' compensation obligations, and (v) reimbursable employee expenses; (b) continue making deductions in employee paychecks for, among other things, taxes and insurance; and (c) authorizing applicable banks and other financial institutions to receive, process, honor and pay all checks presented for payment and to honor all electronic payment requests made by the Debtors relating to the foregoing.

171.    The Debtors employ in the aggregate approximately 2,843 employees, of whom approximately 527 are salaried and 2,316 are hourly workers (referred to herein as the "Employees"). Almost all of the Debtors' employees are full-time.

172.    More than half of the Debtors' hourly employees are members of either the United Steelworkers of America ("United Steelworkers"), the Glass, Molders, Pottery, Plastics, and Allied Workers International Union ("Allied Workers") or the Independent Patternmakers Union ("Patternmakers").[13] Thus, at least eight (8) active collective bargaining

---

[13]  Employees at Gregg Industries, Inc. and Deeter Foundry, Inc. are non-unionized.

agreements (the "CBAs") govern the employment of most of the Debtors' employees (the "Union Employees").[14]

173.     To minimize the personal hardship those employees will suffer if prepetition employee-related obligations are not paid when due and to maintain employee morale at this critical time, the Debtors, by this Motion, seek authority to pay certain prepetition claims for, among other items, wages, salaries, commissions, bonuses and other compensation, vacation, other paid leave, federal and state withholding taxes, payroll taxes, contributions to employee benefit plans and all other employee benefits that the Debtors pay in the ordinary course (collectively, and as described in Section A herein, the "Employee Obligations") as well as the Reimbursable Expenses (as described in Section B herein).

## THE DEBTORS' EMPLOYEE OBLIGATIONS

### Unpaid Compensation

174.     In the ordinary course of their businesses, the Debtors issue payroll checks on a weekly basis to all hourly employees. The salaried employees are paid either on a bi-monthly basis or on a monthly basis, depending on the facility where the salaried employee works. The aggregate gross monthly payroll for both hourly and salaried employees is approximately $9,370,240.[15]

175.     Because most of the Debtors' employees are paid in arrears and pursuant to various payroll schedules, as of the Petition Date, the employees have not been paid all of

---

[14]  In addition, some truck drivers employed by the Dalton Facilities belong to the Teamsters Union, Local 364.

[15]  Due to a lack of orders, Advanced Cast Products, Inc. recently instituted a policy of shutting down its melting and molding departments for one week each month. The result is a monthly savings of approximately $48,000.

their prepetition wages. The Debtors believe that as of the Petition Date, there was approximately $1,717,221.00 in accrued but unpaid prepetition wages, salaries, commissions, and other compensation, excluding vacation pay, severance pay, deferred compensation and incentive bonus plan (collectively, the "Unpaid Compensation"). Similarly, not all payroll-related taxes (such as employers' FICA payments, Social Security payments, Medicare, unemployment, federal, state and local withholding taxes (collectively, the "Taxes")) have been paid with respect to the Unpaid Compensation. Additionally, the Debtors routinely withhold amounts from employee salaries and wages, and in turn, pay such amounts to third parties on a period basis (the "Withheld Amounts"). Withheld Amounts that remain unpaid as of the Petition Date may include, but are not limited to, employee share of health benefits, employee share of insurance premiums, 401(k) contributions, legally ordered deductions, and other miscellaneous deductions.

      176.    Unpaid Compensation, Taxes and Withheld Amounts may have been due and owing on the Petition Date because, inter alia:

      a.    the chapter 11 petitions were filed during the Debtors' regular and customary salary and hourly wage payroll periods;

      b.    discrepancies may exist between amounts paid and amounts the employees or others believe should have been paid, which, upon resolution, may reveal that amounts are owed to such employees;

      c.    some payroll checks issued to employees prior to the Petition Date have not been presented for payment or cleared the banking system and, accordingly, have not

been honored and paid as of the Petition Date - in particular, the Debtors estimate that the amount of uncashed checks for any thirty day period is approximately $565,125;

        d.       employees may not have been paid all their salaries and wages for services previously performed on behalf of the Debtors; and

        e.       there may be variations in the Debtors' payroll schedules.

177.    The request to pay Unpaid Compensation relates solely to employees that are employed as of the Petition Date. The Debtors recognize the Bankruptcy Code's treatment of unsecured claims of employees for unpaid compensation earned within ninety (90) days before the Petition Date. The Debtors will therefore not pay any employee more than $4,650 for Unpaid Compensation. See 11 U.S.C. § 507(a)(3).

178.    Likewise, from time to time, the Debtors employ individuals on a temporary basis, and these temporary employees are retained and paid through temporary employment agencies (the "Temp Agencies"). The Debtors believe that if the Temp Agencies remain unpaid for prepetition services rendered to the Debtors, the Temp Agencies will not permit the temporary employees to return to their respective positions with the Debtors. The Debtors consider the temporary employees crucial to the reorganization process. Accordingly, the Debtors seek to pay the Temp Agencies for any prepetition amounts related to services provided by the temporary employees as part of the Unpaid Compensation.

## Vacation and Paid Holidays

179.    The Debtors offer paid vacation days ("Vacation") and certain paid holidays ("Paid Holidays") to all employees.  The following is a summary of the Debtors' policies governing the accrual of Vacation and Paid Holidays.

### Neenah Foundry Company and Neenah Transport, Inc.

180.    Using June 1 as a measuring date, Neenah Foundry Company's and Neenah Transport, Inc.'s (collectively, "Neenah") hourly employees earn paid Vacation as follows:[16]

| Length of Service (Years) | Weeks of Paid Vacation |
|---|---|
| 1 – 3 | 1 |
| 3 – 8 | 2 |
| 8 – 14 | 3 |
| 14 – 20 | 4 |
| 20 - 28 | 5 |
| 28 or more | 6 |

181.    Vacation time must be used in the year after it accrues or it is lost.  Under certain circumstances hourly employees may receive vacation pay in lieu of time off.

182.    The Vacation year for Neenah's salaried employees runs from April 1 to March 31.  Salaried employees hired during the months of April, May, June or July will be eligible for 10 days Vacation during the remainder of the vacation year.  Those hired in August, September, October or November will be eligible for 5 days Vacation during the remainder of the vacation year.  Those hired in December, January, February or March will not be eligible for any Vacation during the remaining Vacation year.

---

[16]    These provisions are embodied in the CBA's: the 2002-2006 CBA with Allied, and the 2001-2005 CBA with Patternmakers.

183.    Any salaried employee hired before April 1, 1976 accrues Vacation at a rate of 30 days per year.  Those hired between April 1, 1976 and March 31, 1984 accrue vacation at a rate of 25 days per year.  Those hired between April 1, 1984 and March 31, 1990 accrue Vacation at a rate of 20 days per year.  Those hired between April 1, 1990 and March 31, 1996 accrue Vacation at a rate of 15 days per year.  Those hired between April 1, 1996 and March 31, 2003 accrue 10 days Vacation per year.

184.    Neenah has short and long term disability plans (discussed below) to deal with employee illness or injury.  Neenah offers three days of sick pay annually to cover the period between the onset of illness and the applicable disability policy.

### The Dalton Entities[17]

185.    Dalton's hourly workers who on December 31 have been continuously employed for one year receive paid Vacation time.

186.    Such unionized employees accrue Vacation as follows:

| Length of Service (Years) | Weeks of Paid Vacation |
|---|---|
| 1 – 2 years | 1 |
| 2 years + 1 day – 7 years | 2 |
| 7 years +1 day – 19 years | 3 |
| 19 years and over | 4 |

187.    Generally, Dalton gives hourly employees their Vacation pay in a lump sum on the last payday of January.

---

[17]    These include Dalton Corporation, Dalton Corporation Warsaw, Manufacturing Facility, Dalton Corporation, Ashland Manufacturing Facility, Dalton Corporation, Kendallville Manufacturing Facility, and Dalton Corporation, Stryker Machining Facility.

188.     Employees who do not use all their Vacation receive payment in lieu of

Vacation in a lump sum on or about the last payday in January.

189.     Salaried employees accrue Vacation as follows:

| Length of Service (Years) | Weeks of Paid Vacation |
|---|---|
| 1 – 3 (exempt employees)/5 (non-exempt employees) | 2 |
| 3 (exempt employees)/5 (non-exempt employees) – 15 | 3 |
| 15 – 25 | 4 |
| 25 or more | 5 |

190.     Generally, salaried employees may not cash in or carry over unused

Vacation days, though the Company, in its discretion, may permit employees to do so.

191.     Non-exempt salaried employees also receive up to five days per year of

excused absences with pay, to be used as sick days.  If the employees do not use all of those

days, they receive payment for the unused days at the end of the year.

### Mercer Forge Corporation and A&M Specialties, Inc.

192.     Union employees at Mercer Forge Corporation ("Mercer Forge") and

A&M Specialties, Inc. ("A&M", collectively with Mercer Forge, "Mercer") accrue Vacation

based upon each employee's anniversary date and as follows:

| Length of Service (Years) | Weeks of Paid Vacation |
|---|---|
| 1 – 3 | 1 |
| 3 – 6 | 2 |
| 6 – 10 | $2^{1}/_{2}$ |
| 10 – 15 | $3^{18}$ |
| 15 – 25 | $4^{19}$ |
| 25 or more | $5^{20}$ |

---

[18]   Only at Mercer Forge.

[19]   Only at Mercer Forge.

[20]   Only at Mercer Forge.

193.    Union employees receive payment for accrued, but unused, Vacation, at the end of each year (at each employee's anniversary date), while non-union employees have no such entitlement, absent special permission from Mercer.

194.    Vacation eligibility for non-Union employees is determined on January 1 each year based on years of service and Vacation time accrues as follows:

| Length of Service (Years) | Weeks of Paid Vacation |
|---|---|
| 1 | 1 |
| 2 – 7 | 2 |
| 7 – 13 | 3 |
| 13 – 20 | 4 |

195.    Union Employees receive sick pay benefits under an insured plan.  Under the plan, A&M Union Employees receive $180 per week for up to 26 weeks, beginning on the 8th day of sickness.  Mercer Forge Union Employees receive $200 per week for up to 26 weeks beginning on the 8th day of sickness.

### Advanced Cast Products, Inc.

196.    The Advanced Cast Products, Inc.'s ("Advanced") hourly workers who on July 1 have been continuously employed for one year receive paid Vacation time.

197.    Such employees accrue Vacation days as follows:

| Length of Service (Years) | Vacation Days |
|---|---|
| 1 – 3 | 5 |
| 3 – 5 | 9 |
| 5 – 10 | 11 |
| 10 – 15 | 15 |
| 15 – 20 | 18 |
| 20 – 25 | 20 |
| 25 or more | 25 |

198.     Generally, Advanced gives employees their Vacation pay in a lump sum on the Friday immediately preceding July 4, but employees may all choose to receive the payment on the Friday before taking Vacation time or on a regular pay day after returning from Vacation.

199.     Employees who do not use all their Vacation days receive payment in lieu of Vacation in a lump sum on or about the last payday in June.

200.     Salaried employees hired between January 1 and June 30 receive one week of paid Vacation for their first calendar year of employment. Those hired July 1 or later do not accrue Vacation time until the end of the next calendar year. Thereafter, salaried employees receive Vacation time as follows:

| Length of Service (Years) | Weeks of Paid Vacation |
|---|---|
| 1 – 2 | 2 |
| 2 – 19 | 3 |
| 20 – 25 | 4 |
| 25 or more | 5 |

201.     Salaried employees who leave the company, retire or resign for any reason other than for cause, receive payment for any accrued, but unused, Vacation. Employees discharged for cause do not receive such payment.

202.     All Union Employees are eligible for accident and sickness benefits of $340 per week beginning on the 8th day of illness (or the first day of their injury) for a maximum duration of 36 weeks.

203.     Salaried employees are also eligible for Sick Pay. Exempt salaried employees with less than five years of service are eligible for two months pay at full salary

followed by four months pay at 50% of salary. Those with five to ten years of service receive four months pay at full salary, followed by two months at 50% of salary. Those with more than ten years of services may receive six months pay at full salary.

204. Non-exempt salaried employees with less than five years of service receive eight weeks of pay at full salary followed by 16 weeks at 50% of salary. Those with five to ten years of service may receive 17 weeks pay at full salary followed by nine weeks at 50% of salary. Those with more than ten years of service may receive six months pay at full salary.

205. At the end of a six-month period, sick pay eligibility ends and payment under disability insurance begins, if applicable (discussed below).

### Deeter Foundry, Inc.

206. All employees at Deeter Foundry, Inc. ("Deeter") become eligible for Vacation after one year of continuous service. Vacation eligibility is measured as of each employee's anniversary date. Vacation time accrues as follows:

| Length of Service (Years) | Weeks of Paid Vacation |
|---|---|
| 1 | 1 |
| 2 – 9 | 2 |
| 10 – 20 | 3 |
| 21 or more | 4 |

207. Generally, unused Vacation time may not be cashed in or carried over, though Deeter may permit employees to do so in its discretion.

208. Deeter Foundry, Inc. does not offer sick pay outside of its short term disability plan (discussed below).

## Gregg Industries, Inc.

209.     All employees at Gregg Industries, Inc. ("Gregg") become eligible for Vacation after six months of continuous employment. On the employees 181st day of employment (the first day after six months), will accrue 19.98 hours of vacation; thereafter Gregg's employees will earn vacation benefits per the following schedule, based on their hire date.

| Length of Service (Years) | Weeks of Paid Vacation |
|---|---|
| 1 | 1 |
| 3 – 10 | 2 |
| 11 – 15 | 3 |
| 16 or more | 4 |

210.     The maximum benefits an employee may have at any time will equal two years' benefits. If the employee later uses enough Vacation to fall below the maximum, the employee will resume earning Vacation from that date forward.

211.     Gregg's employees will receive payment of their Vacation benefits with their regular paycheck or with the paycheck used following the date their vacation begins. Although, an employee may request to receive their Vacation benefits before leaving on vacation.

212.     As of the Petition Date, many employees have accrued and unused Vacation days for the 2003 calendar year. The various Debtors also observe several Paid Holidays throughout the year, including federally observed holidays. Among the Holidays recognized by the various Debtors are: New Year's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving (and the day following Thanksgiving), Christmas

Eve, Christmas, one floating holiday, and, at some of the Debtors' locations, the Employee's birthday.

213.    The Debtors request that all employees be authorized to use in the ordinary course of the Debtors' businesses all Vacation and Paid Holidays described in this subpart (b) of the Motion that accrued prior to the Petition Date.

### Paid Leave

214.    Outside the context of Vacation and Paid Holidays, the various Debtor entities offer their employees paid time off under a variety of circumstances ("Paid Leave"). Examples of the Paid Leave provided to the Debtors' employees include, but are not necessarily limited to:

    a.    Funeral/Bereavement Leave.  In the event of the death of family members, employees may have one to six days Paid Leave, depending on the distance to the funeral and the relationship to the deceased;

    b.    Jury Duty Pay.  Generally, an employee required to serve jury duty will be paid the difference between his jury pay and pay for his scheduled time actually lost;

    c.    Military Reserves.  Employees who are members of the active military reserves and is required to attend camp, will receive up to two weeks, the difference between their military pay and the pay for scheduled time lost.

215.    The Debtors seek authority to continue, in their sole discretion, to provide the Paid Leave described in this subpart (c) of the Motion.

## Bonus Plans

216.    The Debtors offer a variety of financial incentives not related to wages to their employees (collectively, the "Bonus Plans").

## Neenah

217.    All of Neenah's approximately 236 salaried employees, who are employed at the end of each fiscal year, are eligible to receive a financial incentive bonus. The financial incentive bonus is calculated as a percentage of each employee's salary with the percentage varying according to position. The payment of the fiscal incentive bonus is contingent upon Neenah's meeting annual performance goals based upon EBITDA. The bonuses are paid at the end of the fiscal year and the fiscal year-end audit, if approved. The annual cost of the fiscal incentive varies greatly from year to year, but generally ranges from $800,000 to $1,000,000.

218.    In addition, Neenah promotes plant safety through a Safety Recognition Promotion Program. Each plant that stays below a minimum number of accidents receives free coffee, soda and doughnuts and its employees may enter a drawing for one of many $25 gift certificates. Additionally, each individual hourly employee who works 12 consecutive months without a work-injury related doctor visit will receive a $50 gift certificate. The approximate cost for these safety programs is $37,450.

## Dalton

219.    All Dalton's salaried employees are eligible for an annual bonus similar to Neenah's fiscal incentive bonus. They receive a percentage of their salary (based on job level) if Dalton meets an annual performance goal based upon EBITDA. The bonuses are paid at the end

of each quarter (annually for executives). Due to performance levels in 2003, Dalton does not believe bonus will be paid this year.

220.     In addition, Dalton's sales personnel are eligible to receive a percentage of their sales relating to any new business they generate in a given year. The sales bonus is paid at the end of the fiscal year. However, Dalton does not anticipate a sales bonus this year.

### Mercer Forge/A&M Specialties, Inc.

221.     All Union Employees at Mercer Forge receive $1 for every .1% over the plant's baseline uptime percentage (set by management). The bonus doubles if plant uptime surpasses 5% over the baseline percentage. This program costs approximately $30,000 annually. Management at Mercer Forge also receives a monthly bonus based on plant uptime percentage. The annual cost of the management uptime bonus is approximately $12,000.

222.     All Union Employees at A&M with at least one year of service as of November 1 of this year will receive a bonus pursuant to the CBA under United Steelworkers. Those with less than one year of service will receive $500. These bonuses will be paid on November 1, 2003. This bonus program is estimated to cost approximately $38,000 annually.

223.     Executives and key management employees at Mercer receive a percentage of their salary as an annual bonus. The percentage varies by job level and ranges from 3% to 40%. Payment is contingent upon Mercer meeting an EBITDA target. This bonus is paid within 60 days of the close of the fiscal year on September 30 and after the fiscal year-end audit. The cost of this bonus program varies from year to year, but is approximately $360,000 at Mercer Forge and approximately $30,000 annually at A&M.

### Advanced Cast Products, Inc.

224.     Advanced pays an annual bonus to management employees.  There are currently 15 employees eligible to receive this bonus, at various management levels ranging from the President to the Machine Shop Manager.  Like the fiscal incentive bonuses paid by the other Debtors, it is a percentage of each employee's salary (percentage based upon job level), and payment is contingent upon the company's achievement of an EBITDA target.  Due to performance at Advanced, no bonus will be paid in 2003.

### Deeter Foundry, Inc.

225.     All of Deeter's full time employee's are eligible to receive bonuses.  Hourly employees may receive bonuses based upon attendance, safety performance, and referrals of new employees.  The attendance incentive is paid each quarter, while the safety incentive is paid every two months.  The referral incentive is paid in two installments:  20% of the bonus is paid 60 days after the referred employee's start date; and the remaining 80% is paid after six months.  The approximate annual cost of these bonus programs is $35,000.

226.     All salaried employees are eligible to receive an annual fiscal incentive bonus over those described above and payment is contingent upon the company's achievement of an EBITDA target.  It is paid in November and costs Deeter approximately $88,000 annually.

227.     The Debtors seek authority to, in their sole discretion, (i) continue to honor and perform all of the Bonus Plans, including, but not limited to, the payment of various amounts which accrued prior to the Petition Date and (ii) modify the Bonus Plans in the ordinary course of business as the Debtors may determine in their sole discretion.

## Employee Benefits

228.    The Debtors have established various plans and policies to provide their employees with medical, dental, prescription drug, life insurance, travel accident and other similar benefits (collectively, the "Employee Benefits"). These Employee Benefits are briefly described below.

### *Health Benefits*

### Neenah

229.    Neenah's employees may choose to receive medical coverage through one of two Health Maintenance Organizations ("HMO's") or comprehensive insurance through Humana. Neenah's employees have a portion of the monthly premiums deducted from their paycheck in the second half of each month.

230.    Neenah also shares the cost of dental insurance with its employees and their families. Dental premiums are deducted from employee paychecks in the first half of each month.

231.    Neenah also maintains a reimbursement plan that covers specified non-covered expenses for up to $5,000 per year. This plan is limited to a small number of executives.

232.    The total monthly cost to Neenah of maintaining the medical insurance, dental insurance and the reimbursement plan is approximately $604,000.

### Dalton

233.    All of Dalton's employees receive medical insurance. Dalton's Stryker Machining Facility is fully insured. The other Dalton entities are self-insured up to a stop loss of

$175,000 per year per employee. For Dalton Stryker, employee premiums are deducted weekly from their paychecks. Self-insured reimbursement of claims are paid twice per week. In 2002, the Dalton entities paid approximately $6,579,000 in reimbursements and premiums to maintain these medical benefits.

234.     Dalton also provides self-insured programs to reimburse employees for dental, vision and hearing aid expenses. In 2002, the Dalton entities paid approximately $245,000 to provide these reimbursement programs.

### Mercer Forge/A&M Specialties, Inc.

235.     Mercer provides fully-insured medical coverage to all its employees through an HMO. Mercer pays monthly premiums and employees make co-payments for office visits and prescription drugs, as well as pay deductibles

236.     The total monthly cost to Mercer of maintaining the medical insurance benefits is approximately $82,500.

237.     Members of the U.S. Steelworkers at A&M receive dental and vision coverage, with each Union Employee contributing $5 per week for such coverage.

238.     Like Neenah, Mercer maintains a reimbursement plan to certain executives for otherwise non-covered medical, dental and vision expenses up to $5,000 per calendar year.

### Advanced Cast Products, Inc.

239.     All employees at Advanced receive coverage through medical, dental and vision plans. Medical insurance is self-insured up to a stop loss amount of $125,000 per

individual claim. This medical coverage is provided through a Preferred Provider Organization ("PPO"), Highmark Preferred Blue. Advanced has insurance coverage for amounts in excess of the stop loss amount through Highmark Life & Casualty Group. Employees make contributions through deductions from each paycheck. Advanced makes monthly payments to medical providers.

240. All employees receive dental coverage through a self-insured plan. Employees make contributions through deductions from each paycheck. Advanced makes monthly payments to dental providers.

241. All employees may receive vision coverage through a fully insured plan, Highmark Blue Opti-Choice. Employees make contributions through deductions from each paycheck.

242. The total monthly cost to Advanced of maintaining the medical insurance benefits is approximately $101,385.

### Deeter Foundry, Inc.

243. Deeter shares the cost of medical insurance with all employees through a fully insured Blue Cross/Blue Shield plan. Employees pay premiums through deductions from each paycheck, as well as pay deductibles and co-payments. Deeter pays monthly premiums.

244. Deeter also provides a fully insured dental plan to all employees through Ameritas, which covers 100% of preventable procedures, 80% of basic procedures and 50% of major procedures. Employees pay premiums through deductions from each paycheck, in addition to paying deductibles. Deeter pays monthly premiums.

245.    The total monthly cost to Deeter of maintaining the medical insurance benefits is approximately $36,000.

## Gregg Industries, Inc.

246.    All employees of Gregg may receive medical and dental coverage through fully insured plans. Medical coverage is provided through an HMO operated by Blue Cross of California. Hourly employees pay premiums through weekly deductions from their paychecks. Salaried employees pay premiums through bi-weekly deductions. All employees make co-payments for office visits and prescription drugs. Gregg pays monthly premiums to Blue Cross.

247.    Dental insurance is provided through United Concordia. Hourly employees pay premiums through weekly deductions from their paychecks. Salaried employees pay premiums through bi-weekly deductions. All employees make co-payments for office visits and prescription drugs. Gregg pays monthly premiums to United Concordia.

248.    The total monthly cost to Gregg of maintaining the medical insurance benefits is approximately $134,000.[21]

### *Employee Life And Disability Benefits*

## Neenah

249.    Neenah provides all it hourly employees with $24,000 in term life insurance through Fortis. Neenah pays 90% of the premiums, while the employees cover the remaining 10% through deductions from each paycheck. Salaried employees may receive life

---

[21]  This amount reflects a 13% rate increase that is being shared between Gregg and its employees as of April 14, 2003.

insurance under all the same terms, except that they have three choices of life insurance coverage: the amount of their salary, two times the amount of their salary, or $50,000. Neenah offers Accidental Death and Dismemberment ("ADD") insurance in the amount of $24,000.

250.    Neenah's hourly employees have a fully insured short term disability ("STD") plan through Fortis. The plan provides a weekly benefit for up to 26 weeks. Employees pay 10% of the STD premiums through deductions from each paycheck. Neenah pays the remainder through monthly payments. Neenah's salaried employees receive a salary continuation program that runs for six months. The salaried STD is underwritten by Neenah.

251.    Once the Sick Pay for salaried workers expires, a fully insured LTD plan through Fortis takes over. The plan provides 60% of gross wages until the employee reaches 65 or is no long disabled, whichever comes first. Salaried employees pay 10% of LTD premiums through deductions from each paycheck.

252.    It costs Neenah approximately $405 per employee annually to maintain the above described benefits.

**Dalton**

253.    Dalton offers term life insurance to all its full time employees through Fortis. The amount of insurance varies by job classification and ranges from $20,000 to $300,000. Employees pay a portion of the premiums through deductions from each paycheck, and Dalton pays the remainder monthly. Dalton also provides ADD insurance on the same terms, but only to salaried employees.

254.    Dalton pays for LTD coverage through Fortis for all management employees. The benefit is 60% of base salary until age 65 or the end of the disability, whichever comes first.

255.    It costs Dalton approximately $434 per employee annually to maintain the above described benefits.

### Mercer Forge/A&M Specialties, Inc.

256.    All Union Employees receive $20,000 in Life Insurance at Mercer Forge and $15,000 at A&M Specialties, Inc. Salaried employees at both entities receive life insurance of twice their salary in Life and ADD Insurance, with a maximum of $250,000. Union Employees' Life Insurance is through Home Protected Life, while salaried Life Insurance is through Fortis. Employees contribute to premiums through deductions from each paycheck, and Mercer pays the remainder monthly.

257.    All non-union employees at Mercer are eligible for six months of salary continuation while on STD. After six months, they become eligible for the fully insured LTD plan. All non-union employees at Mercer are eligible for LTD pay at Mercer's expense. The plan provides 60% of gross wages until the employee reaches 65 or is no longer disabled, whichever comes first. Salaried employees pay 10% of LTD premiums through deductions from each paycheck.

258.    It costs Mercer approximately $439 per employee annually for the above described benefits.

### Advanced Cast Products, Inc.

259.     Hourly employees at Advanced may receive both Life in the amount of $20,000 and ADD Insurance in the amount of $20,000.  Salaried employees may receive Life Insurance in an amount from one and one-half to two times their salary with a maximum of $275,000.  Salaried employees also have the option of participating in a separate contributing plan with a maximum of $150,000.  All Life and ADD Insurance is provided through Fortis.

260.     With the exception of the optional contributory plan (which is partially funded through deductions from each paycheck), Advanced fully funds the Life and ADD Insurance through monthly premiums.

261.     Salaried employees of Advanced are eligible for LTD insurance through Fortis.  The benefit paid is 50% of base salary until age 65 or the end of the disability, whichever comes first.

262.     It costs Advanced approximately $145 per employee annually to provide the above described benefits.

### Deeter Foundry, Inc.

263.     Deeter provides all its employees with Life and ADD Insurance through Fortis.  Employees have the option of maintaining policies in the amount of one or two times annual income.  Eligibility for Life and ADD Insurance begins after 60 days of employment. The employees fund 10% through deductions from each paycheck.  Deeter pays the remainder to Fortis monthly.

264.     Deeter provides LTD Insurance to all employees through Fortis. Employees pay 10% of the premiums through deductions from each paycheck. Deeter pays these premiums to Fortis monthly. The plan pays 60% of wages, after a 90 day waiting period, until age 65 or the end of the disability, whichever comes first.

265.     It costs Deeter approximately $306.50 per employee annually for the above described benefits.

### *Other Employee Benefits*

266.     The Debtors offer of other Employee Benefits. The following is a summary of some, but not all, of such other Employee Benefits.

267.     Several of the Debtors offer partial reimbursement for education expenses. For example, Neenah provides 50% (75% for salaried workers) reimbursement for job-related courses after a year of employment, with management pre-approval. The program costs Neenah approximately $10,000 annually. Dalton maintains a similar tuition reimbursement program at an approximate annual cost of $25,000. Advanced provides a tuition reimbursement for its salaried employees that costs approximately $16,000 annually. Deeter has a similar plan.

268.     Several of the Debtors have various programs in place to compensate employees who incur relocation expenses. Neenah has such a policy for exempt employees wishing to move from a distance greater than 50 miles, paying, with Human Resources approval, the cost of a U-Haul or other rental vehicle, a meal for the movers, and a relocation allowance of $250 to $500. Where an employee is required by management to relocate, Neenah pays for house-hunting, trips, living expenses, moving expenses, mileage, travel and storage expenses,

lease cancellation changes, assistance in purchasing real estate, and other expenses. Deeter and Mercer also have programs in place to pay relocation expenses.

269. The various Debtor entities maintain many smaller benefit programs for the comfort and safety of their employees. These programs include allowances for, among other things, safety shoes, goggles, uniforms, gloves and boots.

270. Other programs maintained by the Debtors for the convenience of employers include company cars for some sales personnel and executives. Also, some employees may be provided with cellular telephones, pagers, computer hardware, internet access and certain other equipment on a discretionary, as needed basis.

271. In order to maintain employee morale and loyalty, several of the Debtors have a practice of providing Thanksgiving and/or Christmas turkeys and hams from time to time.

272. The Debtors seek authority to continue, in their sole discretion, to provide for the Employee Benefits and the Other Employee Benefits described in this subpart (e) of this Motion.

## Retirement

273. The following is a summary of the Retirement Benefits provided by the Debtors.

## Neenah

274. Members of the Patternmakers and Allied Workers Unions are provided both a defined benefit and a 401(k) plan. Neenah's salaried workers also have a 401(k) plan.

Neenah contributed to these 401(k) plans by matching 50 cents for each dollar contributed by the Employee up to 5%, quarterly.

275.     The amount spent on matching contributions in 2003 is expected to be $420,000. The estimated annual cost of all Neenah's Pension Plans is $3,152,000. Payments pursuant to the Pension Plans are due on October 15, 2003 of $166,326.

276.     In addition, Neenah's hourly retirees receive Life Insurance of $1,000 and medical insurance paying for 25-50% of covered expenses depending upon age at retirement and years of service.

277.     Salaried employees who retire with more than 15 years of continuous service will be entitled to a term life insurance policy of $2,000, at Neenah's expense.

278.     The spouses of retired salaried employees may continue the same coverage of Health Benefits until the spouse turns 65 or until the children no longer qualify as dependents. Neenah's salaried retirees continue to receive medical insurance paying for 30 to 85% of coverage expenses, depending upon age at retirement and years of service.

### Dalton

279.     All of Dalton's Union Employees have a defined benefit plan. In addition, all union and non-union employees, after a probationary period, have a 401(K) plan. Salaried employees are matched by 100% of the first 3% of employee contributions to the 401(K) plan. Union Employee contributions are not matched.

280.     Dalton gave out a supplemental employee retirement plan ("SERP") to officers and directors during the 1980's. There is only one active employee eligible for the

SERP, Dalton's President. Several former management employees either are receiving or soon will be receiving payments under the SERP.

281. Dalton expects the amount spent on matching contributions in 2003 to be $215,000. The total annual cost of all Dalton's Pension Plans is approximately $903,000. The next quarterly contributions of approximately $70,422 are due on September 5, 2003 and again on October 15, 2003.

282. In addition, all retirees (with the exception of hourly workers at Dalton Corporation and Dalton Corporation Kendallville Machining Facility) are eligible to receive retiree Life and Medical Insurance.

### Mercer Forge/A&M Specialties, Inc.

283. For its U.S. Steelworkers employees, Mercer contributes $.70 for each hour worked into a Steelworkers Pension Trust Fund (a U.S. Steelworkers Plan); A&M similarly contributes $.70 for each hour worked to the Steelworkers Pension Trust Fund. In addition, some Mercer employees are also covered by a Gales Group Pension Plan (from years of service prior to ACP Holding Company's acquisition of Mercer).

284. Mercer's salaried and non-union employees have a 401(k) plan in place. Mercer matches employee contributions to the 401(k) plan at 50 cents per dollar up to 6% of employee contributions.

285. Mercer expects to spend approximately $45,000 on quarterly matching contributions in 2003. The estimated cost of all Mercer's pension plans is $415,000 annually. Mercer Forge has an approximately $9,709 payment due to the U.S. Steelworkers Trust at the

end of each month, and a quarterly match to the 401(k) plan due October 15, 2003 in the amount of $11,700. A&M has a $1000 payment due to the Steelworkers Pension Trust Fund at the end of each month.

286.    In addition, Mercer Forge's Union retirees receive Life Insurance of $1,000, at company expense, reduced to $500 for retirees over the age of 70.

### Advanced Cast Products, Inc.

287.    Hourly employees at Advanced are provided with a defined benefit plan and a non-matching 401(k) plan. Salaried employees are provided with a 401(k) plan which the company matches 50% the first 6% of each employee's contribution.

288.    Advanced expects to pay approximately $54,000 on quarterly matching contributions in 2003. The annual cost of all pension plans is estimated at $600,000. There is a $164,776 payment due September 15, 2003 for the hourly workers' defined benefit plan.

289.    In addition, Advanced offers Life Insurance to all retirees in the amount of $5000 for hourly and $7500 for salaried employees.

### Deeter Foundry, Inc.

290.    Deeter provides a 401(k) plan for all employees. Deeter matches 50% of the first 5% of employee contributions to the plan.

291.    Deeter expects to spend approximately $60,000 on quarterly matching contributions in 2003.

### Gregg Industries, Inc.

292.     Gregg offers a 401(k) plan to all its employees.  Gregg matches 50% employee contributions up to 6% of each employee's salary.

293.     Gregg expects to spend approximately $50,000 on quarterly matching contributions in 2003.

294.     In addition, Gregg provides supplemental Life Insurance for approximately 15 retirees, and an annual Holiday ham to approximately 40 retirees.  The average annual cost of these programs is approximately $500.

### Workers' Compensation Obligations and Related Insurance

295.     The Debtors purchase premium-based insurance covering workers' compensation, product, general and automobile liability (collectively, the "Liability Insurance") (together with Self-Insured Workers' Compensation Benefits, the "Workers' Compensation Obligations") in all states in which they operate, except to the extent that the Debtors are self-insuring employers for workers' compensation as described above.  In connection with the Liability Insurance, the Debtors make 10 payments each year in the amount of $640,626 as pre-funded cash collateral and fixed costs, which is used to pay new and continuing workers' compensation claims.

296.     Furthermore, under the varying state statutory schemes, default on the current Self-Insured Workers' Compensation Benefits may result in the withdrawal of the Debtors' privilege to do business within the states, the imposition of fines and penalties upon the Debtors and the loss of the Debtors' statutory immunity provided by workers' compensation

laws, exposing the Debtors to suits at common law by injured employees. Similarly, failure to pay the Liability Insurance may subject the Debtors to high insurance rates, if insurance is available at all, upon renewal. Accordingly, the Debtors believe that it is in the best interest of their estates and their creditors that they be authorized, but not required, to continue paying the Workers' Compensation Obligations in the ordinary course of business.

297. Accordingly, the Debtors seek authority to continue paying the prepetition employee workers compensation obligations described in this subpart (i) of the Motion.

**Prepetition Deductions and Payments Withheld From Employee Paychecks**

298. The Debtors make certain deductions from employees' paychecks, including, without limitation, (a) payroll taxes and the employee's portion of FICA and unemployment taxes, (b) employee contributions for the Health Plans, group term life insurance, additional life and accidental death and dismemberment insurance and other insurance programs, (c) employee contributions to retirement savings plans, Internal Revenue Code § 125 Cafeteria Plans and retirement savings plan loan repayments, (d) legally ordered deductions such as wage garnishments, child support and tax levies, and (e) voluntary contributions to charities, political action committees and management association and union dues (collectively, the "Employee Deductions"). The Debtors forward amounts equal to the Employee Deductions from their general operating accounts to appropriate third-party recipients. Due to the commencement of these Chapter 11 Cases, these funds were deducted from employee paychecks but may not have been forwarded to appropriate third-party recipients. Prior to the Petition Date, potentially unremitted Employee Deductions totaled approximately $1,159,600.

299.    By this Motion, the Debtors seek authority to forward the Employee
Deductions to the appropriate parties.

## REIMBURSABLE BUSINESS EXPENSES

300.    Prior to the Petition Date in the ordinary course of their businesses, the
Debtors reimbursed employees and directors for certain expenses incurred in the scope of their
employment. As of the Petition Date, the Debtors estimate they owe approximately $51,184 in
reimbursable business expenses. These amounts are prepetition expenses relating to, inter alia,
business-related travel expenses, business meals, phone and facsimile costs, seminars and other
job related training expenses, car expenses, mileage reimbursement, periodical subscriptions and
other miscellaneous business expenses. In addition, drivers for Neenah Transport, Inc. purchase
pre-paid cards to pay toll authorities in Indiana, Illinois and Ohio (together with all expenses
described in this paragraph, the "Reimbursable Expenses"). All of such expenses were incurred
on the Debtors' behalf and with the understanding that they would be reimbursed. Accordingly,
to avoid harming individuals who incurred the Reimbursable Expenses, the Debtors seek to be
authorized, but not required, to pay the Reimbursable Expenses in the ordinary course of
business.

301.    I submit that any order granting such relief is in the best interest of the
Debtors, their estates, and any other parties-in-interest.

**B.**    **Motion for Order Authorizing Use of Cash Collateral and Granting Adequate Protection Pursuant to Bankruptcy Code §§ 361 and 363(c)(2)(B) & (e)**

302.    The Debtors seek entry of an order authorizing certain of the Debtors obligated under the Credit Agreement (as defined below)[22] (the "Obligor Debtors") to use of cash collateral and granting adequate protection pursuant to §§ 361 and 363(c)(2)(B) & (e) of Title 11 of the United States Code.

303.    The Debtors submit that for their reorganization to be successful it is essential that they be authorized to operate their respective businesses and to satisfy all reasonable, ordinary, and necessary operating expenses and thereby preserve the value of their businesses for the benefit of all creditors and other parties-in-interest. Such operating expenses include, without limitation, cost of payroll, utilities, taxes, maintenance charges, and insurance premiums, and payment of other ordinary course expenses as detailed in the Budget (defined and discussed below).

304.    The Debtors bring this motion in an effort to avoid any potential dispute or controversy in the future concerning the operation of their businesses or the conduct of these Chapter 11 Cases. In furtherance of the same, the Debtors request that this Court determine that the Obligor Debtors may use Cash Collateral without any further authority of the Court.

305.    A pressing concern for the Obligor Debtors is the need for the immediate use of Cash Collateral on an interim basis pending a final hearing on the Motion. The Obligor

---

[22] The Obligor Debtors consist of the following entities: NFC Castings, Inc., Neenah Foundry Company, Cast Alloys, Inc., Neenah Transport, Inc., Advanced Cast Products, Inc., Gregg Industries, Inc., Mercer Forge Corporation, Deeter Foundry, Inc., Dalton Corporation, Belcher Corporation, Peerless Corporation, A&M Specialties, Inc., Dalton Corporation, Warsaw Manufacturing Facility, Dalton Corporation, Ashland Manufacturing Facility, Dalton Corporation, Kendallville Manufacturing Facility, Dalton Corporation, Stryker Machining Facility

Debtors require the ability to use cash-on-hand as of the Petition Date, as well as that cash which will be generated by the continued operation of their businesses, which is subject to the security interests of certain parties described further below. The Obligor Debtors need this cash to fund critical operating expenses to continue day-to-day operations, including to fund payrolls, and to provide essential services to their clients and customers for ordinary course maintenance and other operating requirements.

306.    The Budget details by line item the ordinary course of business expenses, including trade vendor payments to be made in accordance with normal credit terms; wages, salaries and benefits; and other amounts paid or to be paid for arms-length services in accordance with the prior course of dealing with each of the Obligor Debtor entities.[23]

307.    The Obligor Debtors seek permission to use the Cash Collateral in the ordinary course of business in accordance with the Budget attached to the proposed cash collateral order as Exhibit A (the "Budget"), with an allowable fifteen percent (15%) overall variance.

308.    To protect the value of Debtors' businesses, it is essential that Debtors continue "business as usual" and continue to pay for and provide such ordinary course services as applicable. The Obligor Debtors face immediate and irreparable injury, loss, and damage with respect to their businesses if they are unable to use Cash Collateral in the manner requested.

---

[23]  In separate motions filed contemporaneously herewith, Debtors seek the authority of this Court to continue to pay trade vendors in the ordinary course of business and to continue their customary payments to affiliates for arms-length services including wages, employee benefits and other normal expenses.

309.     As of the Petition Date, the total amount outstanding under the Credit Agreement is approximately $146,626,932.44 million principal outstanding, excluding outstanding letters of credit in the amount of $864,675.00.

310.     The Debtors believe that the Lenders are oversecured. As a consequence of the foregoing, the Obligor Debtors propose adequate protection for the Lenders in the form of a replacement lien or security interest as described below and in accordance with the terms of the proposed order annexed hereto. As noted, the Obligor Debtors will only use cash collateral in accordance with the Budget attached to the proposed Order.

311.     Thus, the Obligor Debtors propose to give the Lenders a first lien in cash balances and unencumbered property, liens priming certain of the Lenders' liens, liens junior to certain other liens, and a superpriority claim under 11 U.S.C. § 507(b) (the "Adequate Protection Liens") and continue to pay interest as it accrues under the Credit Agreement. The Adequate Protection Liens are provided to the Lenders to protect their interest in the Lenders' Prepetition collateral (the "Prepetition Collateral"), including the Cash Collateral, for and equal in amount to the aggregate diminution in value of the Lenders' interest in the Prepetition Collateral.

312.     Without the Court's permission to use Cash Collateral, Obligor Debtors cannot meet any of their normal and necessary operating expenses -- including without limitation, payroll, utilities, taxes, maintenance charges and insurance premiums -- because their cash is subject to the various security interests of the Lenders. If the Obligor Debtors are not granted authorization to pay such necessary costs, the Debtors will be unable to reorganize.

313.    I submit that any order granting such relief is in the best interest of the

Debtors, their estates, and any other parties-in-interest.

## C.    Motion for Order Under 11 U.S.C. §§ 105(a), 503(b), 546(c)(2) and 546(g), (a) Establishing Procedures for Treatment of Valid Reclamation Claims, and (b) Prohibiting Third Parties From Interfering With Delivery of the Debtors' Goods

314.    The Debtors move the Court for an order (i) establishing procedures for

treatment of valid reclamation claims, and (ii) prohibiting third parties from interfering with

delivery of the Debtors' goods. The Debtors operate a large manufacturing business specializing

in the production and marketing of castings and forgings. In the ordinary course of business, the

Debtors purchase a substantial volume of raw materials and components from third-party

vendors. The Debtors anticipate that the commencement of these Chapter 11 Cases will result in

vendors making reclamation demands under applicable law. In the absence of approved

procedures for the reconciliation and treatment of such demands, numerous reclamation demands

could adversely affect the Debtors' operations in the critical period immediately after the Petition

Date.

315.    The Debtors propose the following procedures for the processing and

treatment of reclamation claims:

a.    Any vendor asserting a claim for reclamation must satisfy all

requirements entitling it to have a right of reclamation under applicable state law and section

546(c)(1) of the Bankruptcy Code;

b.    After receipt of all reclamation demands and an opportunity to

review such demands, the Debtors will file a notice (the "Reclamation Notice"), and serve such

Reclamation Notice on parties in interest, listing those reclamation claims and amounts, if any, which it deems to be valid pursuant to the Order requested herein;

c. Absent further order of the Court, the Reclamation Notice shall be filed by the Debtors within ninety (90) days of the Court's order approving this Motion;

d. If the Debtors fail to file the Reclamation Notice within the required period of time, any holder of a reclamation claim may bring a motion on its own behalf, but may not bring such a motion earlier than ninety (90) days after the Court's order approving this Motion;

e. All parties in interest shall have the right and opportunity to object to the inclusion or omission of any asserted reclamation claim in the Reclamation Notice as set forth therein;

f. Any reclamation claim that is included in the Reclamation Notice and is not the subject of an objection within twenty (20) days after service of the Reclamation Notice shall be deemed a valid reclamation claim allowed by the Court; and

g. All valid reclamation claims pursuant to the above-described procedure will be deemed administrative expenses of the Debtors' estates, subject to the requirements of applicable law.

316. I submit that any order granting such relief is in the best interest of the Debtors, their estates, and any other parties-in-interest.

**D.     Motion for Order Under 11 U.S.C. §§ 105(a) and 366, (a) Prohibiting Utilities from Discontinuing, Altering or Refusing Service, and (b) Establishing Procedures for Determining Adequate Assurance of Payment**

317.    The Debtors hereby move the court for an order (a) prohibiting utilities from discontinuing, altering or refusing service; and (b) establishing the procedures for determining adequate assurance of payment. Pursuant to sections 105(a) and 366 of the Bankruptcy Code, the Debtors request entry of an order (1) prohibiting their utility companies (the "Utility Providers") from discontinuing, altering or refusing service and (2) establishing a procedure for determining adequate assurance.

318.    Section 366(a) of the Bankruptcy Code prevents utility companies from discontinuing, altering or refusing service to a debtor during the first twenty (20) days of a bankruptcy case (the "Stay Period"). However, upon expiration of the Stay Period, a utility company has the option of terminating its services if a debtor has not furnished adequate assurance of payment.[24]

319.    Uninterrupted utility services are essential to ongoing operations and, therefore, to the success of the Debtors' reorganization. The Debtors are engaged in the manufacture of gray and ductile iron castings, forged components and machined components for sale to municipal and industrial customers. The Debtors' municipal products include, among other things, sewer castings and manhole covers and frames. The Debtors' industrial products include, among other things, castings for the transportation and farm equipment industry, as well as components for compressors used in heating, ventilating and air conditioning equipment. As

---

[24]   The Debtors reserve the right to declare that any of the entities listed on Exhibit A are not utilities within the meaning of section 366(a) of the Bankruptcy Code.

such, the Debtors cannot continue to perform without utility services. Should the Utility Providers refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted. The impact on the Debtors' business operations and revenue would be extremely harmful and would jeopardize the Debtors' reorganization efforts. It is therefore critical that utility services continue uninterrupted. In fact, if there is interrupted service to the Debtors' furnaces for more than 4 hours, the iron in the furnaces will solidify. It would be impossible to re-start the cooled furnaces, which would be a solid block of iron and metal weighing (depending on the furnace) 10-60 tons, and the cooled furnaces would be impossible to move or to discard.

320.    In the operation of their facilities, the Debtors incur utility expenses for water, sewer service, electricity, gas, local telephone service, long-distance service, and waste disposal. These utility services are provided by numerous Utility Providers. A non-exhaustive list of these Utility Providers is attached as Exhibit A to the motion and is incorporated herein by reference.[25]

321.    Accordingly, the Debtors seek entry of an order (the "Order") providing, among other things:

a.    that, absent any further order of this Court and except as otherwise provided herein, the Utility Providers are forbidden to discontinue, alter or refuse service on

---

[25] Although the Debtors believe that the list of Utility Providers attached as Exhibit A to the motion is a complete list, they reserve the right, without further order of the Court, to supplement the list if any Utility Provider has been omitted.

account of any unpaid prepetition charges, or request payment of a deposit or receipt of other security in connection with any unpaid prepetition charges;

b.    that the Debtors will serve the Order on the Utility Providers via U.S. Mail, within five (5) business days of the date this Order is entered by the Court (the "Date of Entry");

c.    that a Utility Provider may request additional assurance of payment in the form of deposits or other security within thirty (30) days of the Date of Entry (an "Additional Assurance Request") and, if the Debtors believe the Additional Assurance Request is unreasonable, the Debtors will promptly schedule a hearing to determine if additional assurance is necessary (the "Determination Hearing");

d.    that any Additional Assurance Request must (i) be made in writing and (ii) must include a summary of the Debtors' payment history relevant to the affected account(s);

e.    that pending resolution of any such Determination Hearing, any Utility Provider making an Additional Assurance Request shall be prohibited from discontinuing, altering or refusing service to the Debtors on account of unpaid charges for prepetition services;

f.    that a Utility Provider shall be deemed to have adequate assurance of payment until a future order of this Court is entered in connection with a Determination Hearing; and

g.      that if a Utility Provider makes an Additional Assurance Request

that the Debtors believe is reasonable, then the Debtors shall be entitled to comply with such

request, as described in this Motion, without further order of the Court.

322.    I submit that any order granting such relief is in the best interest of the

Debtors, their estates, and any other parties-in-interest.

E.      **Motion Seeking Entry of an Order Authorizing Debtor Neenah Foundry Company To Pay (1) Unpaid Commitment Fee, (2) Postpetition Expense Obligations, and (3) Postpetition Indemnification Obligations**

323.    The Debtors are seeking entry of an order authorizing the Debtor Neenah

Foundry Company ("Neenah") to pay (1) the unpaid balance of the commitment fee,

(2) postpetition expense obligations, and (3) postpetition indemnification obligations to the

Standby Purchasers in accordance with the terms of the certain commitment letters dated June

30, 2003 (the "Commitment Letters") by and among Neenah and the Standby Purchasers party

thereto Commitment Letters.  Neenah has received a commitment from each Standby Purchaser

to purchase its pro rata share of any and all of the Second Secured Notes (other than the Second

Secured Notes to be issued in respect of the Class 4 – PIK Note Claims) not otherwise acquired

by the Noteholders exercising their Rights.  Pursuant to the Commitment Letters, a true and

correct copy of which is <u>Exhibit A</u> to the motion, the Standby Purchasers have collectively

agreed to provide the Debtors with up to $110 million of financing through the purchase, directly

or indirectly, at the Subscription Price, of not only the Units purchasable upon exercise of Rights

they hold, but also any and all unsubscribed Units not purchased by other Holders of Existing

Subordinated Notes pursuant to the Rights Offering.  In consideration of this commitment,

Neenah has agreed, subject to Bankruptcy Court approval, to pay (i) the unpaid Commitment Fee,[26] (ii) postpetition Expense Obligations and (iii) postpetition Indemnification Obligations.[27]

324.     In this Motion, Debtors seek authority to pay the Unpaid Commitment Fee, and to pay for any postpetition Expense Obligations and the postpetition Indemnification Obligations for which they may become obligated pursuant to the Commitment Letters.

325.     If approved by the Court, each Standby Purchaser will receive a Commitment Fee commensurate with the level of their commitment to provide financing to Neenah. A schedule of the proposed Commitment Fees to be paid to each Standby Purchaser and the PIK Noteholder is attached to the Commitment Letters marked as Schedule I.

326.     In accordance with the terms of the Commitment Letters, prior to the Petition Date, Neenah paid the Standby Purchasers $1.1 million of a total commitment fee prepetition with the remaining $4.4 million to be paid upon approval of the terms of the Commitment Letters by the Bankruptcy Court.

327.     The Debtors have also obtained the agreement of the Holders of the PIK Note to exchange the PIK Note for Second Secured Notes pursuant to the Plan. In connection with that agreement, Neenah paid the PIK Note Holders have been paid $50,000 of a total commitment fee of $250,000, with the remaining $200,000 to be paid upon approval of the terms of the Commitment Letters by the Bankruptcy Court. Neenah is seeking authority to pay

---

[26] This Motion only seeks authority to pay the unpaid 80% of the Commitment Fee, which is approximately $4.4 million to the Standby Purchasers and $200,000 to the PIK Noteholder (the "Unpaid Commitment Fee").

[27] The Expense Obligations and Indemnification Obligations have the meanings ascribed to them in the Commitment Letters.

the Unpaid Commitment Fee to the Standby Purchasers and the PIK Noteholder upon approval of this Motion.

328. As a result of the negotiations culminating in the Plan, the Debtors agreed to reimburse the Standby Purchasers for all reasonable actual out-of-pocket fees and expenses (the "Expense Obligations")[28] incurred by or on behalf of the Standby Purchasers in connection with the negotiation, preparation, execution and delivery of the Commitment Letters and any and all definitive documentation or other acts relating hereto or thereto, including, but not limited to, the actual reasonable fees and expenses of counsel, accountants and/or consultants to the Standby Purchasers and the reasonable and documented fees and expenses incurred by the Standby Purchaser in connection with any due diligence (including reasonable fees and expenses paid to consultants), to be paid in the ordinary course. Neenah is seeking authority to pay the postpetition Expense Obligations in the ordinary course.

329. As a result of the negotiations culminating in the Plan, Neenah agreed to indemnify and hold harmless the Standby Purchasers and each of their affiliates, directors, officers, partners, members, equity holders, employees, agents and assignees (including affiliates thereof) (each an "Indemnified Party") from and against any and all losses, claims, damages, liabilities or other expenses to which such Indemnified Party may become subject, insofar as such losses, claims, damages, liabilities (or actions or other proceedings commenced or threatened in respect thereof) or other expenses arise out of or in any way relate to or result from

---

[28] Prior to the Petition Date, the Standby Purchasers and the PIK Noteholder submitted expense invoices to Neenah, which were paid.

the Commitment Letters and Neenah agreed to reimburse each Indemnified Party for any reasonable and documented legal or other expenses incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability or action or other proceeding, but excluding therefrom all expenses, losses, claims, damages and liabilities that are finally determined by a court of competent jurisdiction to have resulted primarily from the bad faith, gross negligence or willful misconduct of such Indemnified Party (the "Indemnification Obligations"). Neenah seeks authority to pay postpetition Indemnification Obligations, if any, in the ordinary course.

330. The obligations of the Standby Purchasers and the PIK Noteholder are subject to certain conditions precedent as outlined in the term sheet attached the Commitment Letters. In addition, certain events are identified as Termination Events in the Commitment Letters.

331. Accordingly, Neenah seeks authorization to pay the Unpaid Commitment Fee, postpetition Expense Obligations and postpetition Indemnification Obligations in accordance with the terms of the Commitment Letters. I submit that any order granting such relief is in the best interest of the Debtors, their estates, and any other parties-in-interest.

## CONCLUSION

332. The Debtor's immediate objective is to maximize the value of its assets following the commencement of this Chapter 11 Case. I believe that if this Court grants the relief requested in each First Day Motion, the prospect of achieving this objective, to the benefit of creditors, parties-in-interest, and the Debtor's estates, will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: _8/5_ , 2003

ACP HOLDING COMPANY, NFC CASTINGS, INC., NEENAH FOUNDRY COMPANY, CAST ALLOYS, INC., NEENAH TRANSPORT, INC., ADVANCED CAST PRODUCTS, INC., GREGG INDUSTRIES, INC., MERCER FORGE CORPORATION, DEETER FOUNDRY, INC., DALTON CORPORATION, BELCHER CORPORATION, PEERLESS CORPORATION, A&M SPECIALTIES, INC., DALTON CORPORATION, WARSAW MANUFACTURING FACILITY, DALTON CORPORATION, ASHLAND MANUFACTURING FACILITY, DALTON CORPORATION, KENDALLVILLE MANUFACTURING FACILITY, DALTON CORPORATION, STRYKER MACHINING FACILITY

By: _Gary W. LaChey_

Gary W. LaChey, Vice President — Finance, Treasurer, Secretary and Chief Financial Officer

SWORN TO AND SUBSCRIBED Before me this 5th day of August, 2003.

_Camille E. Ennis_

Notary Public

My Commission Expires: 5/13/2004

CAMILLE E. ENNIS
NOTARY PUBLIC
STATE OF DELAWARE
My commission expires May 13, 2004