IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ACP Holding Company, et al.,[1] | ) | Case No. 03-_12414_ (_____) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**APPLICATION OF THE DEBTORS FOR ENTRY OF AN ORDER
PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a) AND FED. R. BANKR. P. 2014(a),
2016 AND 5002 AUTHORIZING THE EMPLOYMENT AND RETENTION OF
HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL AS FINANCIAL ADVISORS
TO THE DEBTORS AND DEBTORS IN POSSESSION**

The above captioned debtors and debtors in possessions (the "Debtors") by and

through undersigned counsel, hereby submit this application (the "Application") for an order

pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy

Code") and FED. R. BANKR. P. 2014(a), 2016 and 5002 authorizing the employment and

retention of Houlihan Lokey Howard & Zukin Capital ("Houlihan") as financial advisors to the

Debtors. In support of this Application, the Debtors respectfully state as follows:[2]

**Jurisdiction**

1.    This Court has jurisdiction over this Application under 28 U.S.C. §§ 157

and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M)

---

[1] The Debtors consist of the following entities: ACP Holding Company, NFC Castings, Inc., Neenah Foundry Company, Cast Alloys, Inc., Neenah Transport, Inc., Advanced Cast Products, Inc., Gregg Industries, Inc., Mercer Forge Corporation, Deeter Foundry, Inc., Dalton Corporation, Belcher Corporation, Peerless Corporation, A&M Specialties, Inc., Dalton Corporation, Warsaw Manufacturing Facility, Dalton Corporation, Ashland Manufacturing Facility, Dalton Corporation, Kendallville Manufacturing Facility, Dalton Corporation, Stryker Machining Facility.

[2] The facts and circumstances supporting this Motion are set forth in the Affidavit of Gary W. LaChey, Vice President – Finance, Treasurer, Secretary and Chief Financial Officer of ACP Holding Company, NFC Castings, Inc., Neenah Foundry Company and certain of its subsidiaries, in support of First Day Motions.

DOCKET # 22
DATE 8-5-03

and (O). Venue of these proceedings and this Application is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief requested herein are sections 327(a) and 328(a) of the Bankruptcy Code.

3.    As there are no novel issues of law presented herein, the Debtors waive their right to file a brief in support of the Application pursuant to D. DEL. LR. 7.1.2(A), incorporated by reference into the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware by DEL. BANKR. LR. 1001-(B). Because of the nature of the relief requested in this Application, the Debtors believe that no briefing is required.

**Background**

A.    **The Chapter 11 Filings**

4.    On August 5, 2003 (the "Petition Date"), the Debtors filed voluntary petitions in this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code"). The Debtors continue to manage and operate their businesses as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

5.    No trustee or examiner has been appointed in the Debtors' chapter 11 cases and no official committees have been appointed or designated by the Office of the United States Trustee.

**B.    The Debtors' Businesses**

6.    In 1872, Neenah Corporation, the predecessor to Neenah Foundry Company, was founded as a family-run business in Neenah, Wisconsin. In 1997, Neenah Corporation was acquired by NFC Castings, Inc. ("NFC"), a wholly owned subsidiary of ACP Holding Company ("ACP"). Later in 1997, Neenah Foundry Company, then a wholly owned subsidiary, was merged with and into Neenah Corporation which was then renamed Neenah Foundry Company ("Neenah"). Thereafter, Neenah began a strategic initiative to grow and diversify its businesses by acquiring similar and complimentary companies in the casting and forging industries. ACP, NFC, Neenah, and Neenah's domestic subsidiaries[3] are the Debtors in these chapter 11 cases.

7.    The Debtors have manufacturing facilities in Wisconsin, Nebraska, Ohio, Pennsylvania, Indiana, and California. The Debtors sell their products throughout the 48 continental United States.

8.    The Debtors manufacture and market a wide range of iron castings and steel forgings for municipal markets and selected segments of industrial markets. The Debtors' broad range of municipal iron castings include manhole covers and frames, storm sewer frames and grates, heavy-duty airport castings, specialized trench drain castings, specialty flood control castings and ornamental tree grates. The Debtors sell these municipal castings throughout the

---

[3] The domestic subsidiaries are the following direct and indirect wholly owned subsidiaries of Neenah: Advanced Cast Products, Inc. (as well as its inactive wholly-owned subsidiaries Belcher Corporation and Peerless Corporation), the inactive subsidiary Cast Alloys, Inc., Dalton Corporation (as well as its wholly-owned subsidiaries Dalton Corporation, Warsaw Manufacturing Facility; Dalton Corporation, Kendallville Manufacturing Facility; Dalton Corporation, Stryker Machining Facility; and the inactive subsidiary Dalton Corporation, Ashland Manufacturing Facility), Deeter Foundry, Inc., Gregg Industries, Inc., Mercer Forge Corporation (as well as its wholly-owned subsidiary A&M Specialties, Inc.), and Neenah Transport, Inc. (collectively, the "Subsidiaries").

United States to state and local governmental entities, utility companies, precast concrete manhole structure producers, and contractors for both new construction and infrastructure replacement. The Debtors are also a leading manufacturer of a wide range of complex industrial castings, including castings for the transportation industry, the farm equipment industry, and the heating, ventilation and air conditioning ("HVAC") industry.

9.      In fiscal year ended September 30, 2002, the Debtors' net sales were in excess of $405 million and the book value of the Debtors' assets was in excess of $582 million. The Debtors currently employ approximately 2,800 full time employees of whom approximately 2,300 are hourly and 500 are salaried.

## C.      Debt Structure

### (i)      Secured Debt

10.      As of June 30, 2003, there was approximately $146.6 million principal outstanding under the Neenah's existing credit facility (the "Existing Credit Facility"), with JPMorgan Chase serving as agent for the Existing Credit Facility lenders, consisting of: (a) $28.5 million under the revolving credit facility, excluding an additional $1.1 million of outstanding letters of credit; (b) $5.3 million under an acquisition loan facility maturing in June 2004, (c) $.3 million under the Tranche A term loan maturing in September 2003; (d) $46.8 million under the Tranche B term loan maturing in September 2005; and (e) $65.7 million under the Tranche B2 term loan maturing in September 2005. Neenah's obligations to its lenders under the Existing Credit Facility are secured by a first priority lien in all of its assets and the assets of its Subsidiaries and are guaranteed by NFC and the Subsidiaries on a senior secured basis. As of

June 30, 2003, there was approximately $11.6 million outstanding (including accrued and unpaid interest and financing fees) under the $9.9 million face amount of the paid-in-kind note (the "PIK Note") Neenah issued to Citicorp Venture Capital, Ltd. ("CVC") on April 29, 2002. Neenah's obligations under the PIK Note are secured by a second lien on all of its assets and the assets of its Subsidiaries and are guaranteed by NFC and the Subsidiaries. In addition, as of June 30, 2003, the Debtors had approximately $5.4 million in capitalized leases and $16.9 million in unsecured trade debt.

(ii)    *Unsecured Debt*

11.    In addition, as of June 30, 2003, there was approximately $302.9 million outstanding (including accrued and unpaid interest, and excluding an unamortized premium of $2.4 million) under the three tranches of unsecured 11⅛% Senior Subordinated Notes (the "Existing Subordinated Notes") issued by Neenah totaling $282 million in face amount. The active Subsidiaries are guarantors of the Existing Subordinated Notes.

12.    In addition, as of June 30, 2003, there was approximately $5.4 million outstanding (including accrued and unpaid interest) under the $4.3 million face amount senior subordinated note due 2005 issued by NFC to CVC. Furthermore, as of June 30, 2003, there was approximately $6.3 million outstanding (including accrued and unpaid interest) under the $2.5 million senior subordinated note due 2003 issued by ACP and currently held by CVC. Both of these notes are structurally subordinated to the Existing Subordinated Notes and contractually subordinated to the Existing Credit Facility and the PIK Note.

**D.     Recent Developments**

13.     Beginning in 2000, several trends converged to create a difficult operating environment for the Debtors. First, there were cyclical declines in some of the Debtors' most important markets – such as trucks, railroad, construction, and agriculture equipment. Second, there was an inventory adjustment by manufacturers in the HVAC equipment industry, resulting in fewer orders for the Debtors' castings for use in HVAC equipment. Third, domestic foundries have been suffering from excess capacity, increased foreign competition, price reduction pressure from customers and competitors, and increased costs associated with heightened safety and environmental regulations. Such conditions caused over 75 foundries in the United States to cease operations or file for bankruptcy protection in 2001 and 2002.

14.     In May 2002, William Barrett, formerly chief executive officer of Neenah, assumed the role of chief executive officer of the Debtors. The Debtors' new management implemented a number of aggressive measures to help mitigate the effects of the declining market and to improve cash flow, such as selling numerous small, non-core assets, significantly reducing the number of employees, reducing capital expenditures, and imposing selected price increases.

15.     Nevertheless, as a result of the leverage the Debtors employed to finance their acquisitions and the continuing declines in many of their primary customers' markets, the Debtors' financial flexibility deteriorated. On May 1, 2003, Neenah failed to make a scheduled $15.7 million interest payment on the Existing Subordinated Notes. At such time, Neenah was not in compliance with the March 31, 2003 EBITDA covenant under the Existing Credit Facility

and did not have sufficient liquidity to make the interest payment and remain in compliance with the liquidity covenant under the Existing Credit Facility. Accordingly, Neenah was prohibited from making the interest payment pursuant to the terms of the Forbearance Agreement entered into under the Existing Credit Facility.[4]

## E.    The Chapter 11 Cases

16.    The Debtors commenced these chapter 11 cases to eliminate a substantial amount of debt, significantly reduce cash interest expense payments, and improve the Debtors' balance sheet and operating flexibility. Additionally, the Debtors seek to complete certain restructuring initiatives and maintain and enhance their market leadership position.

17.    On May 1, 2003, the Debtors circulated an Offering Memorandum, Solicitation Of Releases, Consents and Acceptances and Disclosure Statement (collectively the "Offering Memorandum"), together with a plan of reorganization. The Offering Memorandum commenced both an exchange offer on the Existing Subordinated Notes and the prepetition solicitation of acceptances of a plan in accordance with section 1126(b) of the Bankruptcy Code. The exchange offer, which was to be completed outside of Court, did not result in the requisite percentage of Existing Subordinated Notes tendered, and both the exchange offer and the solicitation of acceptances for the May 1, 2003 plan of reorganization were allowed to expire.

18.    Shortly after the Offering Memorandum was circulated, Neenah entered into confidentiality agreements with Holders of a majority of the Existing Subordinated Notes

---

[4] Capitalized terms used but not defined herein have the meaning ascribed to them in the Disclosure Statement, dated as of July 1, 2003 (the "Disclosure Statement") filed contemporaneously herewith.

who had formed an unofficial committee that has worked with the Debtors to develop and finance a revised plan of reorganization.

19.    On July 1, 2003, the Debtors circulated the Disclosure Statement for the prepetition solicitation of votes with respect to the Prepackaged Joint Plan of Reorganization of ACP Holding Company, NFC Castings, Inc., Neenah Foundry Company and Certain of Its Subsidiaries under Chapter 11 of the United States Bankruptcy Code (the "Plan"). The Plan is the result of detailed negotiations with the Holders of Existing Subordinated Notes represented on the unofficial committee and is supported by that committee.

20.    The Debtors have obtained from Fleet Capital Corporation and Fleet Securities, Inc. a commitment letter dated June 1, 2003 committing to provide the New Credit Facility substantially on the terms outlined in the New Credit Facility Commitment Letter, as described in further detail in the Disclosure Statement.

21.    The Debtors have also obtained Standby Commitment Agreements from the Standby Purchasers whereby the Standby Purchasers have collectively agreed to provide the Debtors with up to $110 million of financing for the plan. In connection with that commitment, the Standby Purchasers have been paid 20% of a total commitment fee of $5.5 million, with the remaining 80% to be paid upon approval of the terms of the Standby Commitment Agreements by the Bankruptcy Court. The Debtors have also obtained the agreement of the Holders of the PIK Note to exchange the PIK Note for Second Secured Notes and Warrants pursuant to the Plan. In connection with that agreement, the PIK Note Holders have been paid 20% of a total

commitment fee of $250,000, with the remaining 80% to be paid upon approval of the terms of the Standby Commitment Agreements by the Bankruptcy Court.

22.     The Debtors have obtained the requisite votes to confirm the Plan from the Holders of claims or interests entitled to vote on the Plan and, accordingly, the Debtors intend to proceed towards swift confirmation of the Plan.

## Relief Requested

23.     By this Application, the Debtors seek to employ and retain Houlihan pursuant to sections 327(a) and 328(a) of the Bankruptcy Code as their financial advisors in these Chapter 11 Cases, upon the terms and conditions contained in the Engagement Letter dated January 17, 2003 (the "Engagement Letter"). A copy of the Engagement Letter is attached hereto as Attachment A.

24.     Houlihan has a wealth of experience in providing financial advisory services in reorganization proceedings and has an excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States.

25.     The compensation arrangement provided for in the Engagement Letter as modified herein is consistent with and typical of arrangements entered into by Houlihan and other financial advisory firms with respect to rendering similar services for clients such as the Debtors.

26.     The Debtors believe that Houlihan is well qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner.

### Houlihan's Qualifications

27.     Houlihan is a nationally recognized investment banking/financial advisory firm with 9 offices worldwide, and more than 300 professionals. Houlihan provides investment banking and financial advisory services and execution capabilities in a variety of areas, including financial restructuring, where Houlihan is one of the leading investment bankers and advisors to debtors, bondholder groups, secured and unsecured creditors, acquirors, and other parties-in-interest involved in financially distressed companies, both in and outside of bankruptcy. Houlihan's Financial Restructuring Group, which has over 100 professionals dedicated to such engagements, will be providing the agreed-upon financial advisory services to the Debtors. Houlihan has served as a financial advisor in some of the largest and most complex restructuring matters in the United States, including serving as the financial advisor to the debtors in the Chapter 11 proceedings of XO Communications, NII Holdings, Inc. (Nextel International), Covad Communications, Inc., Galey & Lord, Inc. and AmeriServe Food Distribution, Inc., and as the financial advisor to the official creditors committees in the Chapter 11 proceedings of Enron Corporation, Worldcom, Inc., Williams Communications Group, Inc., Laidlaw, Inc., and The Loewen Group, Inc., to name a few of its representative engagements.

28.     David R. Hilty, Managing Director of Houlihan, a copy of whose affidavit (the "Affidavit") is attached hereto as <u>Attachment B</u>, has previously worked on many chapter 11 and out-of-court restructurings, advising both debtors and creditors in various cases and has vast experience working on companies in distressed situations.

29.     Since January of 2003, Houlihan has rendered financial advisory services
to the Debtors in connection with their restructuring efforts. Houlihan has become thoroughly
familiar with the Debtors' operations and is well qualified to represent the Debtors as financial
advisors in connection with such matters in a cost-effective and efficient manner.

### Houlihan's Disinterestedness

30.     To the best of the Debtors' knowledge, and as disclosed herein and in the
Affidavit, (a) Houlihan is a "disinterested person" within the meaning of section 101(14) of the
Bankruptcy Code and as required by section 327(a) and referenced by section 328(c) of the
Bankruptcy Code, and holds no interest adverse to the Debtors and their estates for the matters
for which Houlihan is to be employed, and (b) Houlihan has no connection to the Debtors, their
creditors or their related parties herein except as disclosed in the Affidavit.

31.     Houlihan was retained by the Debtors effective January 17, 2003 and has
been paid for services rendered to the Debtors through August 31, 2003. During the period prior
to the petition date, the Debtors have made payments to Houlihan aggregating $1,275,001.54,
comprised of the following: (i) $1,225,000.00 for monthly advisory fees, and (ii) $50,001.54 for
reimbursement of out-of-pocket expenses. Houlihan's last Monthly Fee paid by the Debtors
covers the period from August 1, 2003 through August 31, 2003. Houlihan has agreed that it
will credit the portion of such Monthly Fee relating to the period subsequent to the Petition Date
against any amount payable to Houlihan pursuant to applicable court orders. These payments
were for services provided prior to the commencement of these cases, and include full payment

for all prepetition fees and expenses. Accordingly, Houlihan is not a prepetition creditor of the Debtors.

32.     Houlihan will periodically review its files during the pendency of these Chapter 11 Cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, Houlihan will use reasonable efforts to identify such further developments and will file a Supplemental Affidavit as Rule 2014(a) of the Federal Rules of Bankruptcy Procedure requires.

## Scope of Services

33.     The parties have entered into the Engagement Letter, which governs the relationship between Houlihan and the Debtors. Houlihan will provide such financial advisory services (the "Services") as Houlihan and the Debtors shall deem appropriate and feasible in order to advise the Debtors in the course of these Chapter 11 Cases, including, but not limited to, the following:

a.     Advise the Debtors generally of available capital restructuring and financing alternatives, including recommendations of specific courses of action, and assist the Debtors with the design of alternative Transaction structures and any debt and equity securities to be issued in connection with a Transaction;

b.     Assist the Debtors in discussions with lenders, noteholders and other interested parties regarding the Debtors' operations and prospects and any potential Transaction;

c.      Assist the Debtors with the development, negotiation and
implementation of a Transaction or Transactions, including participation as a representative of
the Debtors in negotiations with creditors and other parties involved in a Transaction;

d.      Assist in valuing the Debtors and/or, as appropriate, valuing the
Debtors' assets or operations; provided that any real estate or fixed asset appraisals needed
would be executed by outside appraisers;

e.      Provide expert advice and testimony relating to financial matters
related to a Transaction or Transactions, including the feasibility of any Transaction and the
valuation of any securities issued in connection with a Transaction;

f.      Advise the Debtors as to potential mergers or acquisitions, and the
sale or other disposition of any of the Debtors' assets or businesses;

g.      Advise the Debtors and act as a placement agent, as to any
potential financings, either debt or equity, including debtor-in-possession financing;

h.      Assist the Debtors in preparing proposals to creditors, employees,
shareholders and other parties-in-interest in connection with any Transaction;

i.      Assist the Debtors' management with presentations made to the
Debtors' Board of Directors regarding potential Transactions and/or other issues related thereto;
and

j.      Render such other financial advisory and investment banking
services as may be mutually agreed upon by Houlihan and the Debtors.

34.     The types of transactions contemplated by the Debtors' retention of Houlihan include, but are not limited to, (i) one or more exchange offers whether under any applicable securities laws or regulations or otherwise or any cash tender offer or any combination thereof; (ii) (a) any merger, consolidation, reorganization, recapitalization, or business combination, including any transaction pursuant to which the Debtors are acquired by, or combined with, any person, group of persons, partnership, corporation or other entity other than a subsidiary or affiliate (an "Acquiror") or (b) the acquisition, directly or indirectly by an Acquiror (or by one or more persons acting together with an Acquiror pursuant to a written agreement or otherwise), in a single transaction or a series of transactions, of (1) all or substantially all of the assets or operations of the Debtors or (2) all or substantially all outstanding or newly-issued shares of the Debtors' capital stock (or any securities convertible into, or options, warrants or other rights to acquire such capital stock); or (iii) any other transaction in which the requisite consents to a reorganization or restructuring are obtained either out-of-court or pursuant to a Chapter 11 plan of reorganization or restructuring plan confirmed pursuant to Section 1129(b) of the United States Bankruptcy Code.

35.     The Services that Houlihan will provide to the Debtors are necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully.  The Debtors believe that the Services will not duplicate the services that, subject to this Court entering or having entered appropriate orders, other financial advisors, if any, would provide to the Debtors in these Chapter 11 Cases.  Specifically, Houlihan will carry out unique functions

and will use reasonable efforts to coordinate with the Debtors' other retained professionals to avoid the unnecessary duplication of services.

## Terms of Retention

36.     Houlihan has agreed to represent the Debtors for compensation at the amounts agreed upon between the parties pursuant to the Engagement Letter. As more fully described in the Engagement Letter, in consideration of the Services provided by Houlihan, the Debtors have agreed to pay Houlihan:

a.     *Monthly Fees*: a cash fee of $175,000.00 per month (the "Monthly Fee"). Notwithstanding any termination of the Engagement Letter, the Debtors agreed to pay Houlihan the Monthly Fee for a minimum of three (3) months. The first Monthly Fee shall be payable, in cash, upon the Debtors' and Houlihan's execution of the Engagement Letter. All additional Monthly Fees shall be due and payable in cash in advance on the each monthly anniversary of the date of the Engagement Letter.

b.     *Transaction Fee*: In addition to the foregoing Monthly Fees, upon the earlier of (i) closing or consummation of a Transaction, or, November 30, 2003, the Debtors shall pay Houlihan a cash Transaction Fee of $3,000,000.00. The Transaction Fee shall be payable only upon the consummation of a Transaction with respect to which Houlihan has provided material services hereunder, occurring either (i) during the term of the Engagement Letter or (ii) within twelve months of the effective date of termination of the Engagement Letter (such twelve-month period being referred to herein as the "Tail Period") provided that such Tail Period shall extend no later than 18 months from the date of the Engagement Letter. Fifty

percent (50%) of the Monthly Fees paid to Houlihan after (but not including) the first six (6) months of this agreement shall be credited against the Transaction, provided, however, in no event shall the Transaction Fee be reduced to less than zero.

        c.     *Financings:* If the Debtors elect to refinance any existing obligations or seek new financing during the term of the Engagement Letter, the Debtors may request that Houlihan act as placement agent in connection with such a refinancing. If Houlihan is selected by the Debtors to act as a placement agent, the Debtors shall pay Houlihan a cash financing fee equal to 50 basis points (0.5%) of the amount of new bank debt raised, 100 basis points (1.0%) for any second lien debt raised, 300 basis points (3.0%) of the amount of any non-second lien subordinated debt raised, and 500 basis points (5.0%) of the amount of any equity raised ("Financing Fees"). Any Financing Fees that would be payable to Houlihan by the Debtors if the Debtors request Houlihan to act as a placement agent in connection with a financing would exclude from the amount of capital raised, (i) any debt investment by members of the Debtor's existing bank group, (ii) any debt or equity investment by the management of the Debtors, Citigroup Venture Capital or any of its affiliates, or (iii) any debt or equity investment by the Debtors' existing Senior Subordinated Noteholders. Any Financing Fee shall be in addition to all Monthly Fees and any Transaction Fee paid to Houlihan by the Debtors. As of this time, the Debtors have not requested that Houlihan act as a placement agent for new financing.

        d.     *Mergers and Acquisitions:* If the Debtors determine to dispose of any assets outside the ordinary course of business during the term of the Engagement Letter other than through the consummation of a Transaction, and selects Houlihan to act as the advisor

to the Debtors in connection with such dispositions, Houlihan and the Debtors agree to the good faith negotiation of customary fees and mutually acceptable terms and conditions by the parties hereto. It is understood that the Debtors will not be obligated in any way to retain Houlihan as its advisor in any such sales. As of this time, the Debtors have not selected Houlihan to act as an advisor on the disposition of any assets outside the ordinary course of business.

        e.    *Other Services*: To the extent the Debtors request Houlihan to perform additional services not contemplated by the Engagement Letter, such services and the fees for such services shall be mutually agreed-upon by Houlihan and the Debtors, in writing, in advance.

        f.    *Post-Termination Services*: Furthermore, if at any time after the termination of the Engagement Letter, Houlihan is called upon to render services directly or indirectly relating to the subject matter of the Engagement Letter beyond the services contemplated herein (including, but not limited to, producing of documents, answering interrogatories, giving depositions, giving expert or other testimony, whether by agreement, subpoena or otherwise), the Debtors shall pay Houlihan a mutually agreed-upon reasonable hourly rate for the persons involved for the necessary time expended in rendering such services, including, but not limited to, time for meetings, conferences, preparation and travel, and all reasonable and documented related costs and expenses, inclusive of the reasonable legal fees and expenses of Houlihan's counsel.

        g.    *Expenses*: In addition to the fees described above, the Debtors agree to promptly reimburse Houlihan, upon request from time to time, for all reasonable and

documented out-of-pocket expenses reasonably incurred by Houlihan in connection with the matters contemplated by the Engagement Letter, including, without limitation, reasonable fees of counsel. Out-of-pocket expenses shall include, but not be limited to, all reasonable travel expenses, duplicating charges, on-line service charges, messenger services, delivery services, meeting services and long-distance telephone and facsimile charges incurred by Houlihan (collectively, the "Fee Structure").

37.     Houlihan will seek compensation and reimbursement of expenses, as specified in the Engagement Letter, with the payment of such fees and expenses to be approved in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules and any orders of this Court; provided, however, that the approval of Houlihan's fees and expenses in these Chapter 11 Cases will be subject to the standards contained in section 328(a) of the Bankruptcy Code.

38.     The Debtors also seek approval of the Fee Structure pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that a debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 of the Bankruptcy Code on any reasonable terms and conditions of employment, including a retainer, on an hourly basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Accordingly, section 328(a) of the Bankruptcy Code, therefore, permits the Court to approve the Fee Structure outlined herein. The Fee Structure appropriately reflects the nature and scope of the Services to be provided by Houlihan, Houlihan's substantial experience with respect to financial advisory services, and the fee structures typically utilized by Houlihan and other leading financial

advisors, which do not bill their clients on an hourly basis. Similar fixed and contingency fee arrangements, as described herein, have been approved and implemented in other large chapter 11 cases in this District and elsewhere. See, e.g., In re Trans World Airline, Inc., et al., Case No. 01-0056 (Bankr. D. Del. Jan. 10, 2001) (order dated Jan. 26, 2001 approving the retention of Rothschild, Inc. as financial advisors for the debtors, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code); In re United Artists Theatre Company, et al., Case No. 03514 (Bankr. D. Del. Sept. 7, 2000) (order dated Nov. 14, 2000 approving the retention of Houlihan as investment bankers for the debtors, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code); In re Harnischfeger Industries, et al., Case No. 99-02171 (Bankr. D. Del. June 7, 1999) (order dated Feb. 8, 2000 approving the retention of Blackstone as investment bankers to the debtors, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code).

        39.    Pursuant to Section 331 of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules and Orders of this Court, Houlihan will file interim and final applications with the Court. As Houlihan does not bill on an hourly basis, nor maintain a system to record time, Houlihan should not be required to submit detailed time records in support of interim or final fee applications with the Court. Instead, in support of such applications, Houlihan will establish those services provided on behalf of the Debtors during the applicable period, and those professionals (and their qualifications) who provided such services.

## Indemnification Provisions

40.     Houlihan requests that the indemnification provisions of the Engagement Letter, a copy of which are attached to the Engagement Letter as <u>Attachment A</u> be approved.[5]

41.     The preceding indemnification procedures are in substantially the same form as the indemnification procedures that were negotiated with the U.S. Trustee and approved by the Court in <u>In re United Artists Theatre Company, et al.</u>, Case No. 00-03514 (SLR) (Bankr. D. Del. Sept. 7, 2000), aff'd, 315 F.3d 277 (3d Cir. 2003); <u>In re Ameriserve Food Distribution, Inc.</u>, Case No. 00-0358 (PJW) (Bankr. D. Del. May 9, 2000); <u>In re Planet Hollywood International, Inc.</u>, Case No. 99-3612 (JJF) (Bankr. D. Del. Dec. 17, 1999).

## Notice

42.     Notice of this Motion has been given to the Office of the United States Trustee.  In light of the nature of the relief requested, the Debtors submit that no other or further notice need be given.

## No Prior Request

43.     No prior Application for the relief requested herein has been made to this or any other Court.

---

[5] Houlihan will consent to the indemnification procedures substantially the same form as the indemnification procedures that were negotiated with the U.S. Trustee and approved by the Court in <u>NII Holdings, Inc. et al.</u>, Case No. 02-11505 (MFW) (Bankr. D. Del. May 24, 2002); <u>In re United Artists Theatre Company, et al.</u>, Case No. 00-03514 (SLR) (Bankr. D. Del. Sept. 7, 2000); <u>In re Ameriserve Food Distribution, Inc.</u>, Case No. 00-0358 (PJW) (Bankr. D. Del. May 9, 2000); <u>In re Planet Hollywood International, Inc.</u>, Case No. 99-3612 (JJF) (Bankr. D. Del. Dec. 17, 1999)

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order, substantially in the form attached hereto as Attachment C, authorizing the employment and retention of Houlihan as financial advisors pursuant to the terms of the Engagement Letter, and (b) grant such further relief as is just and proper.

Dated: 8/5 , 2003

ACP HOLDING COMPANY, NFC CASTINGS, INC., NEENAH FOUNDRY COMPANY, CAST ALLOYS, INC., NEENAH TRANSPORT, INC., ADVANCED CAST PRODUCTS, INC., GREGG INDUSTRIES, INC., MERCER FORGE CORPORATION, DEETER FOUNDRY, INC., DALTON CORPORATION, BELCHER CORPORATION, PEERLESS CORPORATION, A&M SPECIALTIES, INC., DALTON CORPORATION, WARSAW MANUFACTURING FACILITY, DALTON CORPORATION, ASHLAND MANUFACTURING FACILITY, DALTON CORPORATION, KENDALLVILLE MANUFACTURING FACILITY, DALTON CORPORATION, STRYKER MACHINING FACILITY

By: _____
Gary W. LaChey
Vice President – Finance, Treasurer, Secretary and Chief Financial Officer