IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ACP Holding Company, et al.,[1] | ) | Case No. 03-_12414_ (____) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## APPLICATION FOR ENTRY OF AN ORDER PURSUANT TO SECTION 327(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 2014(a) AUTHORIZING THE EMPLOYMENT AND RETENTION OF KIRKLAND & ELLIS LLP AS ATTORNEYS FOR THE DEBTORS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this application (the "Application") for entry of an order pursuant to section 327(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rule 2014(a) of the Federal Rules of Bankruptcy (as amended, the "Bankruptcy Rules") authorizing the employment and retention of Kirkland & Ellis LLP ("K&E" or the "Firm") as attorneys for the Debtors. In support of this Application, the Debtors respectfully state as follows:[2]

---

[1] The Debtors consist of the following entities: ACP Holding Company, NFC Castings, Inc., Neenah Foundry Company, Cast Alloys, Inc., Neenah Transport, Inc., Advanced Cast Products, Inc., Gregg Industries, Inc., Mercer Forge Corporation, Deeter Foundry, Inc., Dalton Corporation, Belcher Corporation, Peerless Corporation, A&M Specialties, Inc., Dalton Corporation, Warsaw Manufacturing Facility, Dalton Corporation, Ashland Manufacturing Facility, Dalton Corporation, Kendallville Manufacturing Facility, Dalton Corporation, Stryker Machining Facility.

[2] The facts and circumstances supporting this Application are set forth in the Affidavit of James H.M. Sprayregen, P.C. in Support of the Application to Retain Kirkland & Ellis LLP as Attorneys for the Debtors (the "Sprayregen Affidavit") and the Affidavit of Gary W. LaChey, Vice President – Finance, Treasurer, Secretary and Chief Financial Officer of ACP Holding Company, NFC Castings, Inc., Neenah Foundry Company and certain of its subsidiaries, in support of First Day Motions.



## Jurisdiction

1. This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

2. Venue of this proceeding and the Application is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a).

4. As there are no novel issues of law presented herein, the Debtors waive their right to file a brief in support of the Motion pursuant to D. DEL. LR 7.1.2(a), incorporated by reference into the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware by DEL. BANKR. LR 1001-1(b). Because of the nature of the relief requested in this Motion, the Debtors assert that no briefing is required.

## Background

### A. The Chapter 11 Filings

5. On August 5, 2003 (the "Petition Date"), the Debtors filed voluntary petitions in this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code"). The Debtors continue to manage and operate their businesses as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6. No trustee or examiner has been appointed in the Debtors' chapter 11 cases and no official committees have been appointed or designated by the Office of the United States Trustee.

## B. The Debtors' Businesses

7.      In 1872, Neenah Corporation, the predecessor to Neenah Foundry Company, was founded as a family-run business in Neenah, Wisconsin. In 1997, Neenah Corporation was acquired by NFC Castings, Inc. ("NFC"), a wholly owned subsidiary of ACP Holding Company ("ACP"). Later in 1997, Neenah Foundry Company, then a wholly owned subsidiary, was merged with and into Neenah Corporation which was then renamed Neenah Foundry Company ("Neenah"). Thereafter, Neenah began a strategic initiative to grow and diversify its businesses by acquiring similar and complimentary companies in the casting and forging industries. ACP, NFC, Neenah, and Neenah's domestic subsidiaries[3] are the Debtors in these chapter 11 cases.

8.      The Debtors have manufacturing facilities in Wisconsin, Nebraska, Ohio, Pennsylvania, Indiana, and California. The Debtors sell their products throughout the 48 continental United States.

9.      The Debtors manufacture and market a wide range of iron castings and steel forgings for municipal markets and selected segments of industrial markets. The Debtors' broad range of municipal iron castings include manhole covers and frames, storm sewer frames and grates, heavy-duty airport castings, specialized trench drain castings, specialty flood control

---

[3] The domestic subsidiaries are the following direct and indirect wholly owned subsidiaries of Neenah: Advanced Cast Products, Inc. (as well as its inactive wholly-owned subsidiaries Belcher Corporation and Peerless Corporation), the inactive subsidiary Cast Alloys, Inc., Dalton Corporation (as well as its wholly-owned subsidiaries Dalton Corporation, Warsaw Manufacturing Facility; Dalton Corporation, Kendallville Manufacturing Facility; Dalton Corporation, Stryker Machining Facility; and the inactive subsidiary Dalton Corporation, Ashland Manufacturing Facility), Deeter Foundry, Inc., Gregg Industries, Inc., Mercer Forge Corporation (as well as its wholly-owned subsidiary A&M Specialties, Inc.), and Neenah Transport, Inc. (collectively, the "Subsidiaries").

3

castings and ornamental tree grates. The Debtors sell these municipal castings throughout the United States to state and local governmental entities, utility companies, precast concrete manhole structure producers, and contractors for both new construction and infrastructure replacement. The Debtors are also a leading manufacturer of a wide range of complex industrial castings, including castings for the transportation industry, the farm equipment industry, and the heating, ventilation and air conditioning ("HVAC") industry.

10. In fiscal year ended September 30, 2002, the Debtors' net sales were in excess of $405 million and the book value of the Debtors' assets was in excess of $582 million. The Debtors currently employ approximately 2,800 full time employees of whom approximately 2,300 are hourly and 500 are salaried.

C. **Debt Structure**

*(i)  Secured Debt*

11. As of June 30, 2003, there was approximately $146.6 million principal outstanding under the Neenah's existing credit facility (the "Existing Credit Facility"), with JPMorgan Chase serving as agent for the Existing Credit Facility lenders, consisting of: (a) $28.5 million under the revolving credit facility, excluding an additional $1.1 million of outstanding letters of credit; (b) $5.3 million under an acquisition loan facility maturing in June 2004, (c) $.3 million under the Tranche A term loan maturing in September 2003; (d) $46.8 million under the Tranche B term loan maturing in September 2005; and (e) $65.7 million under the Tranche B2 term loan maturing in September 2005. Neenah's obligations to its lenders under the Existing Credit Facility are secured by a first priority lien in all of its assets and the assets of its

Subsidiaries and are guaranteed by NFC and the Subsidiaries on a senior secured basis. As of June 30, 2003, there was approximately $11.6 million outstanding (including accrued and unpaid interest and financing fees) under the $9.9 million face amount of the paid-in-kind note (the "PIK Note") Neenah issued to Citicorp Venture Capital, Ltd. ("CVC") on April 29, 2002. Neenah's obligations under the PIK Note are secured by a second lien on all of its assets and the assets of its Subsidiaries and are guaranteed by NFC and the Subsidiaries. In addition, as of June 30, 2003, the Debtors had approximately $5.4 million in capitalized leases and $16.9 million in unsecured trade debt.

*(ii)   Unsecured Debt*

12. In addition, as of June 30, 2003, there was approximately $302.9 million outstanding (including accrued and unpaid interest, and excluding an unamortized premium of $2.4 million) under the three tranches of unsecured 11⅛% Senior Subordinated Notes (the "Existing Subordinated Notes") issued by Neenah totaling $282 million in face amount. The active Subsidiaries are guarantors of the Existing Subordinated Notes.

13. In addition, as of June 30, 2003, there was approximately $5.4 million outstanding (including accrued and unpaid interest) under the $4.3 million face amount senior subordinated note due 2005 issued by NFC to CVC. Furthermore, as of June 30, 2003, there was approximately $6.3 million outstanding (including accrued and unpaid interest) under the $2.5 million senior subordinated note due 2003 issued by ACP and currently held by CVC. Both of these notes are structurally subordinated to the Existing Subordinated Notes and contractually subordinated to the Existing Credit Facility and the PIK Note.

59892-001\DOCS_DE:76297.5

**D. Recent Developments**

14. Beginning in 2000, several trends converged to create a difficult operating environment for the Debtors. First, there were cyclical declines in some of the Debtors' most important markets – such as trucks, railroad, construction, and agriculture equipment. Second, there was an inventory adjustment by manufacturers in the HVAC equipment industry, resulting in fewer orders for the Debtors' castings for use in HVAC equipment. Third, domestic foundries have been suffering from excess capacity, increased foreign competition, price reduction pressure from customers and competitors, and increased costs associated with heightened safety and environmental regulations. Such conditions caused over 75 foundries in the United States to cease operations or file for bankruptcy protection in 2001 and 2002.

15. In May 2002, William Barrett, formerly chief executive officer of Neenah, assumed the role of chief executive officer of the Debtors. The Debtors' new management implemented a number of aggressive measures to help mitigate the effects of the declining market and to improve cash flow, such as selling numerous small, non-core assets, significantly reducing the number of employees, reducing capital expenditures, and imposing selected price increases.

16. Nevertheless, as a result of the leverage the Debtors employed to finance their acquisitions and the continuing declines in many of their primary customers' markets, the Debtors' financial flexibility deteriorated. On May 1, 2003, Neenah failed to make a scheduled $15.7 million interest payment on the Existing Subordinated Notes. At such time, Neenah was not in compliance with the March 31, 2003 EBITDA covenant under the Existing Credit Facility

6

and did not have sufficient liquidity to make the interest payment and remain in compliance with the liquidity covenant under the Existing Credit Facility. Accordingly, Neenah was prohibited from making the interest payment pursuant to the terms of the Forbearance Agreement entered into under the Existing Credit Facility.[4]

E. **The Chapter 11 Cases**

17. The Debtors commenced these chapter 11 cases to eliminate a substantial amount of debt, significantly reduce cash interest expense payments, and improve the Debtors' balance sheet and operating flexibility. Additionally, the Debtors seek to complete certain restructuring initiatives and maintain and enhance their market leadership position.

18. On May 1, 2003, the Debtors circulated an Offering Memorandum, Solicitation Of Releases, Consents and Acceptances and Disclosure Statement (collectively the "Offering Memorandum"), together with a plan of reorganization. The Offering Memorandum commenced both an exchange offer on the Existing Subordinated Notes and the prepetition solicitation of acceptances of a plan in accordance with section 1126(b) of the Bankruptcy Code. The exchange offer, which was to be completed outside of Court, did not result in the requisite percentage of Existing Subordinated Notes tendered, and both the exchange offer and the solicitation of acceptances for the May 1, 2003 plan of reorganization were allowed to expire.

19. Shortly after the Offering Memorandum was circulated, Neenah entered into confidentiality agreements with Holders of a majority of the Existing Subordinated Notes

---

[4] Capitalized terms used but not defined herein have the meaning ascribed to them in the Disclosure Statement, dated as of July 1, 2003 (the "Disclosure Statement") filed contemporaneously herewith.

7

who had formed an unofficial committee that has worked with the Debtors to develop and finance a revised plan of reorganization.

20. On July 1, 2003, the Debtors circulated the Disclosure Statement for the prepetition solicitation of votes with respect to the Prepackaged Joint Plan of Reorganization of ACP Holding Company, NFC Castings, Inc., Neenah Foundry Company and Certain of Its Subsidiaries under Chapter 11 of the United States Bankruptcy Code (the "Plan"). The Plan is the result of detailed negotiations with the Holders of Existing Subordinated Notes represented on the unofficial committee and is supported by that committee.

21. The Debtors have obtained from Fleet Capital Corporation and Fleet Securities, Inc. a commitment letter dated June 1, 2003 committing to provide the New Credit Facility substantially on the terms outlined in the New Credit Facility Commitment Letter, as described in further detail in the Disclosure Statement.

22. The Debtors have also obtained Standby Commitment Agreements from the Standby Purchasers whereby the Standby Purchasers have collectively agreed to provide the Debtors with up to $110 million of financing for the plan. In connection with that commitment, the Standby Purchasers have been paid 20% of a total commitment fee of $5.5 million, with the remaining 80% to be paid upon approval of the terms of the Standby Commitment Agreements by the Bankruptcy Court. The Debtors have also obtained the agreement of the Holders of the PIK Note to exchange the PIK Note for Second Secured Notes and Warrants pursuant to the Plan. In connection with that agreement, the PIK Note Holders have been paid 20% of a total

8

59892-001\DOCS_DE:76297.5

commitment fee of $250,000, with the remaining 80% to be paid upon approval of the terms of the Standby Commitment Agreements by the Bankruptcy Court.

23. The Debtors have obtained the requisite votes to confirm the Plan from the Holders of claims or interests entitled to vote on the Plan and, accordingly, the Debtors intend to proceed towards swift confirmation of the Plan.

## Relief Requested

24. By this Application, the Debtors seek to employ and retain the firm of K&E as their counsel with regard to the filing and prosecution of these chapter 11 cases and all related matters, effective as of the Petition Date. Accordingly, the Debtors respectfully request entry of an order pursuant to section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a) authorizing the Debtors to employ and retain K&E as their attorneys to perform the legal services that will be necessary during these chapter 11 cases.

25. The Debtors seek to retain K&E as their attorneys because of the Firm's extensive experience and knowledge in the field of debtors' and creditors' rights and the chapter 11 process and because of its expertise, experience and knowledge practicing before bankruptcy courts, and its ability to quickly respond to all issues that may arise in these chapter 11 cases. In preparing for these chapter 11 cases, K&E has become intimately familiar with the Debtors' businesses and affairs and many of the potential legal issues that may arise in the context of these chapter 11 cases. Accordingly, the Debtors believe that K&E is both well qualified and uniquely able to represent them in these chapter 11 cases in an efficient and timely manner.

9

26. The Firm intends to apply for compensation for professional services rendered in connection with these chapter 11 cases, subject to the approval of the Court and in compliance with applicable provisions of the Bankruptcy Code, this Court's Local Rules and orders of this Court, on an hourly basis, plus reimbursement of actual, necessary expenses and other charges that the Firm incurs. K&E will charge hourly rates to the Debtors that are consistent with the rates charged by K&E in bankruptcy and non-bankruptcy matters of this type. These hourly rates are subject to periodic adjustments, without further notice to the Court or any other entity, to reflect economic and other conditions.

27. The Firm's hourly rates are set at a level designed to fairly compensate the Firm for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses. It is the Firm's policy to charge its clients in all areas of practice for other expenses incurred in connection with the client's case. The expenses charged to the clients include, among other things, photocopying, witness fees, travel expenses, certain secretarial and other overtime expenses, filing and recordation fees, long distance telephone calls, postage, express mail and messenger charges, computerized legal research charges and other computer services, expenses for "working meals" and telecopier charges. The Firm will charge the Debtors for these expenses in a manner and at rates consistent with charges made generally to the Firm's other clients. The Firm prefers to charge these expenses rather than increasing the hourly rates and spreading the expenses among all clients.

28. The professional services that K&E will render to the Debtors may include, but shall not be limited to, the following:

10

a.  advise the Debtors with respect to their powers and duties as debtors in possession in the continued management and operation of their businesses and properties;

b.  attend meetings and negotiate with representatives of creditors and other parties in interest;

c.  take all necessary action to protect and preserve the Debtors' estates, including the prosecution of actions on the Debtors' behalf, the defense of any action commenced against the Debtors, and objections to claims filed against the estates;

d.  prepare on behalf of the Debtors all motions, applications, answers, orders, reports, and papers necessary to the administration of the estates;

e.  negotiate and prepare on the Debtors' behalf a plan of reorganization, disclosure statement, and all related agreements and/or documents, and take any necessary action on behalf of the Debtors to obtain confirmation of such plan;

f.  represent the Debtors in connection with obtaining postpetition loans;

g.  advise the Debtors in connection with any potential sale of assets;

h.  appear before this Court and any appellate courts, and protect the interests of the Debtors' estates before such Courts;

i.  advise the Debtors regarding the maximization of value of the estates for their creditors; and

j.  perform all necessary legal services and provide all other necessary legal advice to the Debtors in connection with these chapter 11 cases.

## No Adverse Interest

29. To the best of the Debtors' knowledge, except as disclosed in the Sprayregen Affidavit filed in support of the Application, K&E does not represent or hold any interest adverse to the Debtors or their estates with respect to the matters on which K&E is to be employed. Further, to the best of the Debtors' knowledge and based on the Sprayregen

11

Affidavit, K&E does not have any connection with any creditors or other parties in interest, or their respective attorneys or accountants, or the United States Trustee or any of its employees, except as set forth in the Sprayregen Affidavit.

30. To the best of the Debtors' knowledge, K&E does not hold or represent any interest adverse to the Debtors' estates, K&E is a "disinterested person" as that phrase is defined in section 101(14) of the Bankruptcy Code, and K&E's employment is necessary and in the best interests of the Debtors and the Debtors' estates.

31. To date, K&E has received approximately $1,340,000 for its prepetition restructuring services, including fees and expenses, incurred since March, 2003. K&E received an advance payment retainer of approximately $350,000 for its prepetition and postpetition services and expenses to be rendered or incurred for or on behalf of the Debtors, the remaining balance of which is approximately $270,000 after giving effect to payment of certain prepetition fees and expenses paid from the retainer. The Debtors have agreed that any portion of the advance payment retainer not used to compensate K&E for its prepetition services and expenses ultimately will be used by K&E to apply against other K&E bills.

## No Prior Request

32. No previous request for the relief sought herein has been made to this or any other Court.

## Notice

33. Notice of the Motion has been given to (a) the Office of the United States Trustee; (b) counsel to the Lenders; and (c) counsel to the Ad Hoc Committee of Bondholders.

12

Following the initial hearing in these cases, notice of the Motion will be given to (i) the Debtors' thirty largest unsecured creditors and (ii) those persons who have requested notice pursuant to Federal Rule of Bankruptcy Procedure 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

59892-001\DOCS_DE:76297.5

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto, authorizing the employment and retention of K&E as attorneys for the Debtors and granting the Debtors such further relief as is just and equitable.

Dated: 8/5, 2003

ACP HOLDING COMPANY, NFC CASTINGS, INC., NEENAH FOUNDRY COMPANY, CAST ALLOYS, INC., NEENAH TRANSPORT, INC., ADVANCED CAST PRODUCTS, INC., GREGG INDUSTRIES, INC., MERCER FORGE CORPORATION, DEETER FOUNDRY, INC., DALTON CORPORATION, BELCHER CORPORATION, PEERLESS CORPORATION, A&M SPECIALTIES, INC., DALTON CORPORATION, WARSAW MANUFACTURING FACILITY, DALTON CORPORATION, ASHLAND MANUFACTURING FACILITY, DALTON CORPORATION, KENDALLVILLE MANUFACTURING FACILITY, DALTON CORPORATION, STRYKER MACHINING FACILITY

By: /s/ Gary W. LaChey
Gary W. LaChey
Vice President – Finance, Treasurer, Secretary and Chief Financial Officer